**MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.**

v.

**AMERICAN BAR ASSOCIATION, et al.**

Civ. A. No. 93–6206.

United States District Court, E.D. Pennsylvania.

Dec. 20, 1994.

**1348**

Harold E. Kohn, Joanne Zack, Kohn, Nast & Graf, P.C., Philadelphia, PA, Kenneth M. Hart, Donovan, Leisure Newton & Irvine, New York City, Lawrence R. Velvel, Michael L. Coyne, Peter M. Malaguti, Constance L. Rudnick, Andover, MA, for plaintiff.

Barbara W. Mather, L. Suzanne Forbis, Pepper, Hamilton & Scheetz, Philadelphia, PA, H. Blair White, David T. Pritikin, William H. Baumgartner, Jr., Sidley & Austin, Chicago, IL, Mark P. Edwards, Morgan, Lewis & Bockius, Philadelphia, PA, Robert A. Burgoyne, Fulbright & Jaworski, Scott Stempel, Morgan, Lewis & Bockius, Washington, DC, for defendants.

OPINION

DITTER, District Judge.

This is a suit for treble damages and attorneys' fees brought by a law school against the American Bar Association, three other organizations involved with legal education, and 22 individual defendants who worked with or for these organizations. The suit results from the ABA's failure to grant the school accreditation.

Presently before me is plaintiff's motion for my disqualification based on the contention that my impartiality might reasonably be questioned. Relying on the provisions of 28 U.S.C. § 455(a), plaintiff asserts that my conduct in this litigation creates the impermissible appearance of bias. In a reply memo in further support of its motion, plaintiff next alleges that my "prominent role" in the ef-forts 20 years ago of another law school to receive accreditation means that I have been "personally involved with issues that lie at the very heart of this action."

Plaintiff goes on to contend that although I notified the parties about my former membership in the ABA at the start of this litigation, I lied to them when I stated the issues here involved are "issues about which I never thought until this case was brought" because the record now reveals I was familiar with those issues based upon my "involvement" with the other law school.

My impartiality is questioned for a fourth reason. Plaintiff's motion is supported by an affidavit of its dean. In that affidavit, he also maintains that I should have brought to plaintiff's attention the fact that I serve on the Board of Consultors of the Villanova University School of Law. The dean advances this argument despite the fact that Harold E. Kohn, Esquire, the attorney for plaintiff who signed the complaint in this case, is himself a member of that same Board of Consultors and was, of course, aware of my membership.

I shall consider plaintiff's contentions in this order: my "involvement" 20 years ago with another law school; my alleged falsehood; my membership on the Board of Consultors with Mr. Kohn; and the rulings I have made in this matter.

**I. The Law of Disqualification**

Plaintiff's motion for my recusal is brought under the provisions of 28 U.S.C. § 455(a) which states:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

In *United States v. Nobel*, 696 F.2d 231, 235 (3d Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), the court of appeals interpreted section 455(a) to require disqualification if there is a "reasonable factual basis for doubting the judge's impartiality ..." *See also United States v. Dalfonso*, 707 F.2d 757, 760 (3d Cir.1983). It has also been held that evidence of bias must

relate to extrajudicial events or sources of information rather than those that come from facts a judge learns from his or her involvement in a case. *United States v. Rosenberg,* 806 F.2d 1169 (3d Cir.1986).

■ Just as a judge should grant the recusal motion where there are sufficient facts to show that a reasonable person would question the judge's impartiality, a judge also has an affirmative duty not to recuse himself or herself in the absence of such proof. *United States v. Burger,* 964 F.2d 1065, 1070 (10th Cir.1992); *Grand Entertainment Group Ltd. v. Arazy,* 676 F.Supp. 616, 619 (E.D.Pa.1987).

■ When proceedings are brought under 28 U.S.C. § 455(a), a judge need not accept as true the motion's factual allegations, but may contradict them with facts drawn from his own personal knowledge. *United States v. Balistrieri,* 779 F.2d 1191, 1202 (7th Cir.1985); *see also United States v. Sciarra,* 851 F.2d 621, 625 n. 12 (3d Cir. 1988). In addition, a judge is not prevented from sitting because he comes into every case with a background of general personal experiences, associations, and beliefs. *Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Eng's,* 388 F.Supp. 155, 159 (E.D.Pa.1974).

■ The passage of time since the judge's participation in an event may require the conclusion that no reasonable person would question his impartiality. *Cipollone v. Liggett Group,* 802 F.2d 658, 659 (3d Cir.1986) (recusal of court of appeals judge in tobacco products liability claim not warranted by the fact that 20 years before, while in private practice, he had represented a cigarette company in a case involving a similar claim). *Cipollone* also cites cases where a variety of times had elapsed since the event in question including six years, four to thirteen years, three to four years, and twelve years. Recusal was not warranted in any of those cases.

■ Prior knowledge about the legal issues involved in a case is not grounds for recusal *Cipollone,* 802 F.2d at 659.

■ Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. Opinions formed by the judge on the basis of events occurring during the course of the current proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make a fair judgment impossible. Thus, judicial remarks that are critical or even hostile to counsel, a party, or their case ordinarily do not support a bias or partiality challenge. *Liteky v. United States,* —— U.S. ——, ——, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

■ In the Third Circuit, review of a district court's action on recusal is by an abuse of discretion standard. Normally, the judge's rulings do not constitute grounds for recusal. *Johnson v. Trueblood,* 629 F.2d 287, 291 (3d Cir.1980).

■ When a judge is named in a mandamus petition, he should not file an answer. His failure to do so should not be taken as an admission of the truth of the allegations of fact contained in the petition. It is appropriate, however, for the judge to file a memorandum in the court of appeals in support and explanation of his challenged action. *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 165 (3d Cir.1993).

## II. My Personal Involvement with the Delaware Law School

■ In its reply memorandum in further support of its motion for my disqualification, the plaintiff states that the essence of its motion is that I have been personally involved with the issues that lie at the very heart of this action because of what I did in 1974–75 to obtain accreditation from the ABA for the Delaware Law School. What it purports to be the factual basis upon which plaintiff relies is found in an affidavit of its dean, Lawrence R. Velvel. The Delaware Law School events are referred to for approximately 38 pages. Central to Mr. Velvel's statement is the fact that my son, J. William Ditter, III, was a student at the Delaware Law School in 1974–75, and the assertion that I was "one of the most active" members of a committee of judges that tried to help Delaware Law School obtain accredi-

tation. Affidavit of Lawrence Velvel at 27.[1] Mr. Velvel goes on to relate that at least three law suits arose out of the school's accreditation efforts.[2] He states that the relevant events concerning Delaware Law School are detailed in those opinions, most extensively in the opinion of Judge Becker in *Plechner v. Widener College, Inc.*, 418 F.Supp. 1282 (E.D.Pa.1976). Mr. Velvel quotes from Judge Becker's opinion concerning the events of 1974–75. It was:

> a tense and critical period in the life of DLS when accreditation of DLS by the American Bar Association (ABA) was in doubt. Unless DLS was accredited prior to the graduation of DLS' first class, graduating students in that class would not be qualified to take the bar examinations in most states. Moreover, later accreditation would not have the effect of qualifying these students. *Plechner*, 418 F.Supp. at 1285.

> . . . . .

> The critical time in the quest for accreditation was the summer of 1975, when the first DLS class was about to graduate, for, as we have noted, under most state bar admissions standards subsequent accreditation does not resurrect a wasted law school career. *Id.* at 1287.

> . . . . .

As a result of the failure of DLS to obtain accreditation after two inspections and with graduation less than one year away, the students and their parents (*led by those parents who were judges and lawyers*) became gravely concerned and be-

gan to articulate that concern. *Id.* at 1289 (emphasis added).

Initially, it should be noted that my son, J. William Ditter, III, was not in the first Delaware Law School class to which Judge Becker refers and therefore the summer of 1975 was not the "tense and critical" time for him as it was for those who were about to graduate. He was graduated the following year, in June of 1976. I am confident that Mr. Velvel's failure to mention this important fact and note the bearing it would have with regard to my interest, concern, and activity on behalf of the school was mere inadvertence on his part.[3]

### A. *Judge DiBona and the Delaware Law School*

Mr. Velvel next extensively references to the deposition of the late G. Fred DiBona, then a member of the Court of Common Pleas of Philadelphia, who died on January 31, 1980. In its reply memorandum in further support of its motion for my disqualification at page 7, plaintiff's counsel notes "neither Judge Ditter's name nor that of his son is mentioned in any of the reported decisions related to the DLS accreditation struggle." It is apparent, therefore, in characterizing my knowledge of the Delaware Law School and my activities on its behalf, Mr. Velvel is relying upon Judge DiBona's deposition, Velvel Aff., Vol. I, ex. 14, and his testimony in *Avins v. White*, Velvel Aff., Vol. I, ex. 17, and the other three exhibits that refer to me by name: the deposition of the Honorable Louis E. Stefan, who died on September 9, 1994, Velvel Aff., Vol. I, ex. 11, the deposition of Alfred Avins,[4] Velvel Aff., Vol. I, ex. 15,

---

**1.** Mr. Velvel also states that I played a "leading role on the judges' committee" Velvel Aff. at 4; said that I was "one of the most active members of a committee of judges *id.* at 12; that I was a "leading member of the Judges' committee *id.* at 24; and that I was a "prominent member" of the Judges' Committee *id.* at 28.

**2.** Exhibits 5 through 10 in support of Mr. Velvel's affidavit suggest there were five suits. In one of them, *Avins v. Moll*, 610 F.Supp. 308 (E.D.Pa.1984), Judge Cahn says there were eight suits resulting from the affiliation of Delaware Law School with Widener University.

**3.** Plaintiff devoted "extensive time" to verifying the extrajudicial facts as thoroughly as it could

without discovery, "verification which involved both library research and a fact-finding trip to Philadelphia, Pennsylvania and Wilmington, Delaware . . ." Velvel Aff. at 7. I do not know why there was no discovery. Plaintiff filed additional affidavits in support of its motion on October 20, November 10, and November 30, 1994.

**4.** Mr. Velvel's affidavit is dated October 12, 1994. By letter dated November 10, 1994, counsel for MSL forwarded to me a four-page declaration of Alfred Avins concerning his recollection of events dealing with the accreditation of Delaware Law School and the taking of my deposition in his suit against James White. *Avins v. White*, 627 F.2d 637 (3d Cir.1980). This declaration dated

and my own deposition, Velvel Aff., Vol. I, ex. 16.

It is Mr. Velvel's contention that MSL's complaint in this case and Exhibit "A", which accompanied it, must have brought what he calls the DLS "embroglio"[5] to my mind and thus led me to the conclusion that the facts concerning MSL and DLS were so similar that an objective person would conclude I could not be impartial as to MSL. It is, therefore, necessary to set forth the Delaware Law School situation in 1974–75 as related by Judge DiBona in his deposition and his account of his activities. Before I do so, however, there are several things I wish to make perfectly clear. First of all, until I read the complaint in this matter, I had never heard of MSL. Second, the facts that I am stating about Delaware Law School come from Judge DiBona's deposition, not from my memory. Third, what I knew about these matters in 1974–75 came almost exclusively from Judge DiBona, as contrasted with from my own firsthand knowledge or activity. Fourth, I have had no reason to think about these matters for almost 20 years and have not done so, and finally, it is Mr. Velvel, not I, who sees the connection between these facts and the conditions that exist at the Massachusetts School of Law and why they would cause a reasonable person to question my impartiality.

### According to Judge DiBona:[6]

(1) As a result of a request made to him in 1974 by Alfred Avins, dean of Delaware Law School, Judge DiBona formed a group known as "The Judges' Committee of the Delaware Law School." Velvel Aff. ex. 14 at 56. Its purpose was to give aid to the school. The real core of the group, the more active members were Judges Ditter, Mirarchi, Blake, Hirsch, Shiomos, and three lawyers, A. Charles Peruto, John or Lou DiGiacomo, and Daniel Rendine. *Id.* at 57. The first meeting of the committee was right after the second ABA report. Supplemental Affidavit of Lawrence R. Velvel, ex. A at 11.[7]

(2) In the winter-spring of 1974, Judge DiBona saw an ABA report concerning DLS. It concluded that the school, its faculty, its library, and its board of trustees were below the standards that were expected of a law school for ABA accreditation. Velvel Aff. ex. 14 at 54–55.

(3) Judge DiBona visited the school and met with "many of the so-called teachers at the school." He was "very much impressed with their lack of ability." *Id.* at 69. One of them was "a man who was way over the hill and just a bit of a nut." So far as another member of the faculty was concerned, "the law seemed to have been the one subject furthest removed from his mind." *Id.* at 70. He had a severe alcoholic problem. It was "not unusual for him not to be able to get to class and ask a student to conduct a course in taxation in his absence." He would live "on

November 9, 1994, obviously played no part in the preparation of Mr. Velvel's earlier affidavit.

5. According to Mr. Velvel's affidavit, pp. 4–5, the embroglio over DLS, in which I "played a role, was no small or forgettable matter." It involved four ABA inspections of DLS; the formation of parents' committees; the formation of a judges' committee on which I played a "leading role"; newspaper articles in the local media and the New York Times; and at least five judicial opinions from my court, by my court's "sister" court in Delaware, and by the Third Circuit. I note, however, that I did not participate in any of the ABA inspections and although I glanced at a report of one of those inspections, I did not read it; I was not involved in any committee except the judges' committee; I did not read then, nor do I read now, the Wilmington, Delaware, papers, or the New York Times; I did not sit in on the trials in this court or our "sister" court in Delaware.

6. Judge DiBona's deposition is Exhibit 14 submitted by Mr. Velvel in support of his affidavit. Its pages are numbered from 42 to 158. In addition, Mr. Velvel's original affidavit attaches as part of Exhibit 17, 55 pages from Judge DiBona's testimony in *Plechner v. Widener College*. Mr. Velvel submitted a supplemental affidavit, attaching to it as an exhibit pages 11–13 and 18–22 from Judge DiBona's testimony in *Avins v. White.* However, I will try to avoid multiple citations that only corroborate that which Judge DiBona said in his deposition.

7. According to Judge Becker, the second ABA inspection took place May 28–30, 1974, and the report was issued in July, 1974. *Plechner,* 418 F.Supp. at 1289. My 1974 appointment book suggests I may have met with Judge DiBona on March 21, and April 25. I have no recollection or note concerning either occasion.

the law school premises and then would leave" and not be available for the next five days. Students were unable to consult with him or ask him questions. He was never "around." *Id.* at 71.

(4) Judge DiBona talked with a member of the Wilmington bar who said that its members thought DLS "was a horrible institution. They thought Avins was an utter disgrace to the community. . . . They just thought it was not a good law school, to put it very mildly." *Id.* at 73.

(5) Judge DiBona noted other problems. "The building was in frightful shape. The classrooms were greatly inadequate size-wise, square footage per student, visibility or control of a class." The library was deficient in many, many respects. There was an inadequate number of volumes. There was no librarian. The library was not open a sufficient number of hours per day to accommodate the needs of the students. *Id.* at 90–91.

(6) Judge DiBona was concerned about the way the school was run. "It was strictly a one-man operation. There were no records of any kind kept." File folders were kept in Welch's fruit juice cartons. "Some of the desks the students were being asked to use were of a size that would be too small for a kindergarten child." *Id.* at 67. Mr. Avins refused to spend money to provide the things that "obviously had to be done to help the law school." *Id.* at 67–68. The judges "pretty well came to the conclusion that perhaps a change of deanship might be indicated." Velvel Supp. Aff. ex. A at 20.[8]

(7) At one of the judges' committee meetings, it was decided that there should be an independent investigation to determine what the accreditation problems were. As a result, it was suggested that Judge DiBona attend the August, 1974, ABA meeting in Hawaii. During that period the judges' committee had "many meetings," "several meetings" in Judge DiBona's chambers. Velvel Aff. ex. 14 at 58–59.

(8) Approximately a week before Judge DiBona left for Hawaii, he learned "the students of the law school had become extremely restless and that they were contemplating some drastic measures to correct what they thought were some of the problems that were hindering their accreditation process." Judge DiBona went to a meeting they had scheduled, but was regarded with "great suspicion" because many of the students thought he was there as Mr. Avins' representative. Judge DiBona spent two hours answering the students' questions. *Id.* at 59–60. Judge DiBona learned the students contemplated "the passing of resolutions demanding the ouster of Avins, demanding the ouster of a good portion of the faculty, . . . the board of trustees. There were threats of a law suit, the appointment of a receiver and all that kind of talk was going on." Judge DiBona told the students he was going to Hawaii and he "pleaded with them not to take any action" until he could return and report to them about what he had learned there. *Id.* at 61–62.

(9) A few days before this meeting, Mr. Avins had told Judge DiBona that "he recognized the fact that he was the stumbling block to accreditation, that he knew there was no way Delaware Law School would be accredited so long as he remained the dean. . . ." *Id.* at 63.

(10) Before Judge DiBona went to Hawaii, *id.* at 66, he met for dinner at Luigi's Restaurant, with Judge Ditter, Charles Peruto, and Mr. Avins. Mr. Avins said one of the reasons he started Delaware Law School was

---

**8.** I have no recollection of attending any such meeting. My appointment book does not list any meeting between April 25 and July 30. My notes of the July 30 meeting start out by saying, "I met today with Judge DiBona, Judge Hirsch, and Charles Peruto in Judge DiBona's office. I had missed the last several meetings of the 'Committee' and therefore had to be filled in on some of the details.

There was a report from the ABA on accreditation—a long report which I did not have time to read. However, it was summed up for me by Peruto in this way—Avins is running a one-man show and they do not like Avins." There is nothing in my notes to suggest the "committee" had decided there should be a change in the deanship. At one point, according to my notes, it was suggested that "autonomous committees, not subject to any veto from Avins" be created, while at another place I noted that Mr. Avins had said if his presence would cost the school accreditation, he would take a leave of absence for a couple of years.

"because it was the only place he could get a job as a law school teacher, that it would have to be his own law school, one that he founded, to obtain a job as a teacher in a law school because he was a controversial figure." *Id.* at 65. His "learning," writing-productivity, and his degrees "made everyone in the ABA envious of him and that . . . would result in non-accreditation so long as he remained the Dean." Velvel Supp. Aff. ex. A at 21–22.

(11) Judge DiBona went to Hawaii and found that his worst expectations had been realized. He "talked to Kelso . . . to Jim White . . . to Ruschlein . . . and to many people whose names" he did not even know. Velvel Aff. ex. 14 at 78. Judge DiBona told them that he wanted to find out what the problems were. They told him "a lot of the things that made it very clear . . . that there was just no way on earth we would get accreditation as long as Avins was the dean. . . . he had a lousy faculty and that he would never get a better faculty so long as he lived." One of the reasons was his character and secondly, he would not permit a situation where good faculty members could come aboard. *Id.* at 80. The salary scale was so low that it could not attract people. *Id.* at 81.

(12) Judge DiBona learned of other problems with the faculty. "They were not competent. They were not the kind of people who should be entrusted with the teaching of law to students . . . They didn't have the kind of ability, they didn't have the kind of freedom, they didn't have the kind of intelligence, experience, devotion." Judge DiBona agreed with that assessment of the faculty. *Id.* at 86.

(13) Judge DiBona was also told the trustees were controlled by Mr. Avins. None had any expertise or knowledge in the teaching of law. None had knowledge with respect to finance, public relations, accounting, or fund raising. *Id.* at 91–92.

(14) Judge DiBona was informed by the persons with whom he met in Hawaii that Mr. Avins had lied to them. "A law school is supposed to have faculty committees, have meetings, and file reports with respect to it and they learned after they had been handed a batch of these reports, they discovered somehow, that, in fact, these committees had never met. There were no such committees and these reports were prepared in a batch by students upon orders by Alfred Avins, that they falsely represented that, in fact, a meeting had been held or meetings had been held." *Id.* at 87. In addition, one of the ABA inspection teams assigned to the library reported to Mr. Avins the absence of a series of books which a good law school library would have. Mr. Avins said the books were there, and the next morning showed them to a member of the inspection team. "They checked and found that those books had been procured in Washington, D.C. . . . during the middle of the night. They used several students to go down there and pick up the books and sneak them into the library." The attitude of those with whom Judge DiBona spoke was that "apart from the fraud that he had practiced upon them, that this was hardly a dean of a law school whose function, one of his chief functions is to teach ethical standards to students, would have his students practice pretty unethical kind of things." *Id.* at 88–89. Mr. Avins admitted in Judge DiBona's presence that this incident had occurred. *Id.* at 89.

(15) After Judge DiBona returned from Hawaii, he met with Mr. Avins and discussed with him the terms under which he would step down as dean. Mr. Avins wanted to have time to think about it. *Id.* at 93–94. Judge DiBona told Mr. Avins "he did not have that kind of time because the student meeting was scheduled for August 20 at which Judge DiBona was expected to report about the results of his trip to Hawaii." *Id.* at 94.

(16) It was agreed that Judge DiBona would tell the students that Mr. Avins had received Judge DiBona's report and was trying to work out the problems that it revealed. *Id.* at 95.

(17) At the meeting with the students, Judge DiBona told them that he had reported to Mr. Avins on his trip to Hawaii and that Mr. Avins would need time to work out the problems. Mr. Avins then assured the students that the problems were minuscule.

*Id.* at 96–97. One of the members of the board, Senator Dean Steele, then spoke to the students and began by saying "that this goddamed ABA, they don't know what the hell they are talking about ... They criticized Tovey. 'What's wrong with John Tovey?' And a group of students got up and said he's a damn alcoholic.... He's the dumbest man in the world. There was real bedlam." *Id.* at 98.

Senator Steele went on to express his views on accreditation: "The McGovern-like ABA was out to get the conservatives of America, that's all the problem was. There's nothing wrong with the building, nothing wrong with the faculty, there's nothing wrong with Avins, nothing wrong with anything. It was the McGovern-like communist leaders of the ABA out to get the conservatives of America." *Id.* Judge DiBona spoke again this time in a highly critical manner of the board and of Mr. Avins, saying that no one should stand in the way of those who were seeking a legal education. The meeting then broke up. *Id.* at 99–100.

Thereafter, Judge DiBona "discussed Mr. Avins' resignation with the students at student meetings, with every member of the board, and had 20 or 30 meetings with Alfred Avins personally to discuss Mr. Avins' resignation." *Id.* at 103, 108–09. Judge DiBona's purpose was to influence Mr. Avins to resign and to influence the board to accept his resignation or to fire him. By this time, Judge DiBona believed that Mr. Avins knew he was no longer acting in the best interest of DLS. Mr. Avins did not care "whether he got accreditation, whether the kids graduated with accreditation or what-have-you. I never believed that Avins wanted accreditation." *Id.* at 104.

(18) The students met with Mr. Avins and asked him to resign. A resolution had been passed in connection with emoluments for his resignation, but it was impossible to get any definitive position from him. *Id.* at 108–109.

(19) On one occasion, Judge DiBona met with Mr. Avins for an hour and fifteen minutes and Mr. Avins repeated the same assertions, " 'there's nothing wrong with the school. The faculty is great. It's the communist, it's the ideological difference and we are going to go to court, we're going to beat them in court. We're going to get mandamus, sue them in Alabama, somehow.' " Judge DiBona then threatened to bring legal action against Mr. Avins to have a receiver appointed to take over the operation of the school. *Id.* at 110–111.

(20) Although he did not attend the meeting, Judge DiBona learned that on August 24, 1974, a delegation of students went to Mr. Avins, demanded his retirement, threatened to strike, picket him, and threatened him with possible violence unless he retired. At the same time, they promised to name the school for him and grant him a stipend if he did retire. *Id.* at 115–116.

(21) On September 8, 1974, Mr. Avins resigned at a meeting of the board of trustees called to consider his resignation and the appointment of new trustees, including Judge DiBona. *Id.* at 100, 102. At that meeting, Judge DiBona said that the board should not appoint any new members until they had an opportunity to gain some input from the new dean.

(22) While Judge DiBona was in Hawaii, he was told that Arthur Weeks would make a good dean for DLS. The next he heard of Weeks was when he learned that Mr. Avins wanted Weeks to be the new dean. *Id.* at 117–118. Although Judge DiBona had never met Mr. Weeks, he was pleased with the selection. *Id.* at 120. Following Dean Weeks' appointment, Judge DiBona supported him. *Id.* at 127.

(23) On September 12, 1974, Judge DiBona wrote to James Patrick White at the Indianapolis School of Law. He was consultant to the council on legal education of the ABA and Judge DiBona wrote to him to explain why he felt the Board of Trustees at DLS should not fill any vacancies until they had input from the new dean. *Id.* at 131–32.

(24) In Judge DiBona's opinion, Dean Weeks made tremendous improvements in the law school between the time of his appointment in September, 1974, and the midyear meeting of the ABA in February, 1975. *Id.* at 134. Judge DiBona attended the ABA committee meeting which considered the ap-

plication of DLS for accreditation. *Id.* Accreditation was refused.

(25) In November or December 1974, Judge DiBona heard that there was a possibility that DLS would affiliate with another school. Dean Weeks had previously told him that such an affiliation might be the answer to obtaining accreditation. *Id.* at 137.

(26) Judge DiBona favored affiliation in the spring of 1975 because the first class was about to graduate. He met constantly with students and parents. Nonetheless, he left the affiliation matter to the board of trustees and he did not become involved at all with any negotiations with Widener College. *Id.* at 146–147.

(27) Shortly after he returned from Hawaii, Judge DiBona organized the "parents association"—a separate group from the Judge's Committee. *Id.* at 74–75. No one was with him in this organization effort at the beginning. *Id.* at 106. It resulted from the fact that parents began to come to meetings of the board of trustees. In early 1975, the parents' association raised between $6,000 and $7,000 to obtain counsel to go to court if necessary, "to force Delaware Law School to act in what the parents considered the best interests of the school." *Id.* at 108.

(28) In the spring of 1975, Judge DiBona attended a parents' meeting where it was agreed that each would put up $50 to create a legal fund to force the board of trustees of DLS to consider affiliation. *Id.* at 138–139. By that time, Alex Sarcione, Mitchell Milner, "Reidel's father-in-law," and Judge DiBona were the active ones in the parents group. *Id.* at 142. Approximately $6000 or $7000 was raised but no suit was started because in April, 1975, the board agreed to seek accreditation. *Id.* at 141. Some of the money was used to pay an attorney who had been hired by the students to represent their interests. *Id.* at 141–142.

(29) From the day that Judge DiBona met Mr. Avins he felt "he was an eccentric, a little nuts, . . . a little weak . . . ," an opinion a lot of other people shared. Nonetheless,

Judge DiBona "tried everything in the world to help him." *Id.* at 113. Judge DiBona was at Mr. Avins "beck and call." Judge DiBona did everything humanly possible to try to raise funds, and even donated his own library to the school. He spoke at meetings, tried to obtain guest speakers for Mr. Avins, introduced him to people and did everything possible to cooperate with him because he admired Mr. Avins and thought he was "an unusually great guy." *Id.* at 114.

(30) Judge DiBona spent a couple of thousand hours on the activities of DLS. He started out in an effort to help his son but was soon catapulted into the position where he stood between 665 students and the dean. They would visit him, write him letters, and it got to the point where he felt he had developed some kind of a father/son relationship with the entire student body. *Id.* at 111–112. At one stage, he had gone to the law school 31 straight nights. *Id.* at 112.

(31) Prior to his going to Hawaii, Judge DiBona was informed by Mr. Avins that he had been appointed as a member of a building committee created by the board of trustees. Together with Charles Peruto, Esquire, Judge DiBona engaged an architect to prepare plans for three new classrooms. Judge DiBona offered to pay for the furnishings of these three rooms but his offer was rejected by Mr. Avins, who believed that the space should be maintained as an auditorium and not divided into class rooms.

I have referred to Judge DiBona's testimony at such length for three reasons:

First, because Mr. Velvel contends that the situation at Delaware Law School and MSL are so much alike [9] that my knowledge of the former creates an appearance of bias against the latter.

Second, because Judge DiBona's deposition shows that he was an active, driving force in obtaining accreditation for the Delaware Law School. Based on what he said, it would be reasonable to conclude that to the extent that any individual was responsible for

9. The critical difference between the DLS and MSL situations is that DLS acceded to the ABA's demands. Pl.'s Pet. for Mandamus at 14.

obtaining that accreditation, it obviously was Judge DiBona.

Third, because Judge DiBona's testimony shows my complete inactivity on behalf of Delaware Law School.

Whatever the situation may have been 20 years ago at Delaware Law School and whether or not Judge DiBona's efforts at that time would require his recusal in this case is, of course, not the question I must determine. Rather, the issue is whether my activities—not his—create in the mind of an objective observer the appearance of partiality. Critical then would be what I said, did, or knew, as revealed by public records and my own records, the similarity of issues, and the passage of almost 20 years.

Judge DiBona's deposition covers 116 pages. There are eight pages on which reference is made to the judges' committee that Judge DiBona formed, including four pages where I am referred to by name.

Page 56—In 1974 right after the ABA report had been received, Mr. Avins asked Judge DiBona to form a committee made up of judges who had sons at the law school, a group that could give some aid to the law school.

Page 57—Judge DiBona described the group he formed as an ad hoc committee and listed some of its more active members. They included Judges Mirarchi, Blake, Hirsch, Shiomos, and Ditter. He also referred to three lawyers, A. Charles Peruto, Lou or John DiGiacomo, and Daniel Rendine. These men were the real core of the group.[10]

Page 58—Prior to August of 1974, the committee, including Judges Hirsch, Mirarchi and Ditter, together with Mr. Peruto, Dan Rendine, and some others had many meetings with Mr. Avins.

Page 64—Prior to Judge DiBona's going to Hawaii, he, Mr. Peruto, Judge Hirsch, and Judge Ditter met with Mr. Avins in Judge DiBona's office.

Page 65—A day or two later Mr. Avins, Mr. Peruto, Judge DiBona and Judge Ditter went to dinner at a restaurant on Second Street.[11] At that time, Mr. Avins said his insulting manner, his controversial conduct, and his pushing people around had made him an enemy of the ABA. He also said that his inability to get a job as a teacher in a law school was one of the reasons he had started DLS.

Although I am not referred to again by name, Judge DiBona explained on page 77 that he had gone to Hawaii to attend the ABA meeting as the result of a discussion at one of the judges' committee meetings. After his return from Hawaii, parents started coming to meetings of the board of trustees, *id.* at 107, and so Judge DiBona organized a committee of parents. *Id.* at 106. This was not the Judge's Committee. (pp. 74, 75) Judge DiBona does not refer to my having been associated in any way with the activities of these parents or the parents' association and, indeed, I was not involved with it in any way.

There are three other exhibits attached to Mr. Velvel's affidavit that refer specifically to me.

In connection with *Plechner v. Widener College,* 418 F.Supp. 1282 (E.D.Pa.1976), the deposition of the late Louis D. Stefan was taken. In the two-page excerpt Mr. Velvel provides as Exhibit 11, Judge Stefan relates that in 1973 he responded to an advertisement about a part-time teaching position but after meeting Mr. Avins decided he would not be interested in teaching on a part-time basis or any other basis at Delaware Law School. Sometime in the summer of 1974, he was contacted by Mr. Avins who wanted to know if he would consider being appointed to the board of trustees. Judge Stefan asked for names of those with whom he could discuss the possibility, and Mr. Avins gave him my name. As a result of the fact that we

---

**10.** Attached to Mr. Velvel's supplemental affidavit are eight pages from Judge DiBona's testimony in *Avins v. White.* Pages 11 and 12 deal with the formation of the judges' committee, and although I am not named, Judge DiBona said the committee included a judge from the United States District Court for the Eastern District of Pennsylvania.

**11.** Judge DiBona referred to this same meeting during his testimony in *Avins v. White.* Velvel Supp. Aff. ex. A at 21.

were good friends, Judge Stefan called me and we discussed his becoming a member of the board.

Exhibit 15 is an excerpt from the deposition of Alfred Avins in a suit he brought against Widener College, 421 F.Supp. 858 (D.C.Del.1976). There are 16 pages provided (the deposition ran beyond page 208). I am referred to on page 75, where Mr. Avins mentions that I had made notes of a dinner meeting that took place prior to Judge DiBona's going to Hawaii in the summer of 1974.[12]

Exhibit 16 is an excerpt of Mr. Avins' testimony in his suit against James P. White, No. 76–134 (D.C.Del.), *rev'd,* 627 F.2d 637 (3d Cir.1980). The eight-page excerpt from Mr. Avins testimony consists almost entirely of my deposition, which in turn is dependent upon the notes I made of what Judge DiBona said on or about August 20, 1974, after he returned from Hawaii. In that deposition, Mr. Avins asked me if Judge DiBona had referred to a conversation in Hawaii with James White. I replied that I did not recall his doing so and that there was nothing in my notes to reflect that there had been such a conversation. In addition, I summarized that it was Judge DiBona's belief that the Delaware Law School would never get accredited as long as Mr. Avins was dean.[13]

Mr. Velvel also attached other exhibits to his affidavit: Exhibit 12 is a four-page excerpt from Judge DiBona's testimony in *Avins v. White;* Exhibit 17 is a four-page excerpt from the testimony of Mitchell W. Miller, Esquire, and a 58–page excerpt from the testimony of Judge DiBona in *Plechner v. Widener;* and Exhibit 18 is a 17–page excerpt from 77 pages of a continued deposition of Richard P. Plechner in *Avins v. Widener.* There is no reference to me in any of these exhibits.

### B. *My Lack of Involvement with Delaware Law School*

In summary, there are approximately 215 pages of Mr. Velvel's exhibits taken from depositions and testimony before various courts. Judge DiBona refers to me four times, Judge Stefan once, and Mr. Avins once. No judicial opinion refers to me at all. The committee formed by Judge DiBona met with him, discussed his going to Hawaii, had meetings with Mr. Avins, and three of its members met with Mr. Avins for dinner. The depositions Mr. Avins took from me referred to Judge DiBona's report to the committee upon his return from Hawaii. It is apparent from the opinions, depositions, and testimony that Mr. Velvel has attached to his affidavit, that the judges' committee formed by Judge DiBona in 1974 was nothing more than Judge DiBona's sounding board. The last meeting Judge DiBona mentions having with the "committee" (actually only with Mr. Peruto and me) took place before he went to Hawaii, *id.* at 65, in August, 1974. My file shows that I met last with Judge DiBona on September 4 and thereafter talked with Judges Mirarchi and Hirsch by telephone on September 5. That ended matters so far as any participation on my part was concerned.[14] Judge DiBona never hints that the members of the judges' committee ever did anything but talk and listen. When he speaks about what he did, Judge DiBona uses the first person singular—and no other. There is nothing to suggest that any member

---

**12.** This is the same meeting that I refer to in subparagraph (10), page 1352. *See also* n. 11, p. 1356. According to my notes, it took place on July 31, 1974.

**13.** The note is dated September 5, 1974, and with regard to Judge DiBona's trip to Hawaii states "During vacation, I believe it was on August 20, 1974, I attended an evening meeting at Judge DiBona's chambers. Present were Peruto—and I believe Judge Mirarchi—and I think Judge Shiomos was there. Judge DiBona reported on the results of his trip to Hawaii. Essentially, he said that he had been told that Delaware Law School could never get accreditation as long as Avins was its Dean because he was paranoid,

had to run a one-man show, would not delegate any authority, and could not attract any kind of a faculty because of his personality."

**14.** The final paper in my file is a letter from Mr. Peruto dated March 21, 1975, telling me that "our committee" contemplated bringing suit to have Mr. Avins removed and asked me for an affidavit summarizing that Mr. Avins had said that because of his background the Delaware Law School would not receive accreditation while he is its dean. There is no indication in my file that I responded to that request, and I have no present recollection one way or the other.

of the committee went to Delaware Law School, met with Mr. White or any other representative of the ABA or saw any representatives of Widener University. There is nothing to suggest that any member of the committee other than Judge DiBona attended an ABA meeting or any of its committee or counsel meetings. Other than Mr. Peruto, we did not even help defray Judge DiBona's expenses when he went to Hawaii. The judges' committee raised no money and did not threaten any legal action. It did not publish a news letter as did the Parents' Association. No member of the committee, other than Judge DiBona met with the trustees of the Delaware Law School, inspected its facilities, interviewed and evaluated the faculty or even met at all after Alfred Avins resigned on September 8, 1974. It played no part in the decision to seek affiliation with Widener. In short, the judges' committee was a group that for a few months in 1974 [15] watched Judge DiBona from the sidelines. It was Judge DiBona who was owner, coach, defense, offense, and even water boy. From time to time he looked to the stands where some of the committee members supported him with a feeble round of applause. While I am honored that on the basis of four references in Judge DiBona's deposition, (pages 57, 58, 64, and 65), and two pages in his testimony, Velvel supp. aff. at 12 and 21, Mr. Velvel attributes to me "a leading role in the judges committee", page 4, said I was "one of the most active members of the committee of judges," page 12, and stated that I was "a leading member of the Judges' Committee," page 28, that honor is tempered somewhat by my knowledge that this was a committee that did almost nothing and can claim no credit for the accreditation of the Delaware Law School.

### C. The Declaration of Alfred Avins

A month after plaintiff's motion for my disqualification was filed, counsel for MSL filed a four-page declaration of Alfred Avins dated November 9, 1994. Mr. Avins states that he was the founding dean of the Delaware Law School which in 1974 and 1975 sought accreditation from the ABA. There were four inspections with accreditation not being granted until after the fourth.

In paragraph 3 of his declaration, Mr. Avins summarizes the alleged shortcomings at Delaware Law School noted by James White and "his accreditation colleagues." In paragraph 4 he reports that a committee was formed to assist in obtaining accreditation. He said it was sometimes referred to as the Judges' Committee and at other times as the Parents' Committee but he refers to it as the former. In paragraph 5 he says I was one of the leading members of that committee, also naming Judge DiBona, Judge Mirarchy (sic), Judge Edward Blake, and the late Judges Hirsch and Shiomos, as well as A. Charles Peruto, Sr., Esquire.

In paragraph 6 he says that he met on "many occasions with members of the Judges' Committee, including Judge Ditter." He goes on, "the members of the Judges' Committee, including Judge Ditter, were strongly in favor of meeting the ABA's demands for rectification of the alleged shortcomings of DLS, and the Committee members, including Judge Ditter, repeatedly urged upon me that DLS should do what the ABA demanded."

In paragraph 7 Mr. Avins states, "Members of the Judges' Committee, including Judge Ditter, also met with ABA accreditors during inspection functions."

He goes on to say in paragraphs 8 and 9 that in 1974, it became clear that DLS would not be accredited as long as he was its dean because the ABA accreditors, especially James White, disliked the fact that he was resisting the ABA's demands and "the fact that I was politically conservative." Members of the Judges' Committee pressed him to resign "at a meeting which began in Judge DiBona's chambers and was continued at Luigi's restaurant. Judge Ditter was present at that meeting and took notes of it."

In paragraph 10 he sets forth that he took my deposition concerning that meeting and that my notes played an important role in the testimony I gave.

---

15. According to Judge DiBona, July and August. My appointment book suggests my first meeting with Judge DiBona was on March 21 and the last on September 4, 1974.

I have referred to Mr. Avins' declaration at some length because it is erroneous in so many respects. While I know his errors are matters of inadvertence and are explainable by the more than 20 years that have elapsed since the events in question, that in no way diminishes the number nor degree of his mistakes. What Mr. Avins says in 1994 differs from his deposition testimony of June 20, 1978, Velvel Aff., Vol. I, ex. 15; differs from Judge DiBona's deposition of March 31, 1976, *id.* ex. 14; and his testimony before Judge Becker on May 11, 1976, *id.* ex. 17; differs from my deposition taken on January 31, 1977, *id.* ex. 16; differs from my contemporaneous notes; and differs from my recollection.

To be specific:

(1) In paragraph 9 of his November, 1994, declaration, Mr. Avins says members of the Judges' Committee urged him "to step down from the deanship." In the excerpts from Mr. Avins' June 20, 1978, deposition, he says nothing about being urged "to step down from the deanship" by the Judges' Committee, the Parents' Association, or by me. According to Mr. Avins, it was the students of the Delaware Law School who mentioned in the summer of 1974 that he should resign. This took place after Judge DiBona returned from Hawaii. *Id.*, ex. 15 at 77. He first considered resigning as dean of the law school after Judge DiBona returned from Hawaii. *Id.* at 71–72.

(2) In his November, 1994, declaration Mr. Avins expands on the matter of his resignation and refers to the dinner meeting at which I was present and comments that I made contemporaneous notes. He says the matter of his stepping down from the deanship was "pressed" on him at that meeting. In his June 20, 1978, deposition, however, Mr. Avins makes it clear that the dinner meeting, which included Judge DiBona, took place *prior* to Judge DiBona's trip to Hawaii, says that the purpose of that trip was to overcome the "political problems" that he had with the ABA, that there was no discussion of his resignation with Judge DiBona prior to Judge DiBona's trip to Hawaii, and that he did not consider resigning until after Judge DiBona came back from Hawaii. *Id.* at 74–75, 76, 73. In short, having established in his June 1978 deposition that the dinner meeting was *before* Judge DiBona went to Hawaii and that he did not discuss resignation with Judge DiBona until *after* the Hawaiian trip, Mr. Avins' November 1994 declaration says he was "pressed" at that same dinner meeting to step down from the deanship. The notes I made of that meeting confirm Mr. Avins' recollection in his June 1978 deposition that there was no discussion about his resigning and contradict his November, 1994, declaration that at that meeting he was "pressed" to do so.[16]

---

**16.** My notes in their entirety concerning this meeting that took place on July 31, 1994 say:

Tonight I met with Dean Avins, Judge DiBona, and Peruto at Judge DiBona's office. We then went to dinner. DiBona presented to Avins the matters we had discussed yesterday—specifically, the need for a Library Committee, Building Committee, Financial Committee, Business Manager or Executive Assistant, etc.

Avins was very tractable and amenable to suggestion. He tended to get bogged down a little bit as to details—for example, as to why he did not feel the Library desk should be changed to another location. However, I finally told him that this was exactly the reason for the appointment of a Library Committee and that while he would certainly be able to express his opinions to the Committee, in the final analysis, the Committee should be the one to decide whether the library desk was moved, painted red, white and blue, or whatever. This got his mind away from some of the details and back to the more pressing matters of overall policy.

I think it was Peruto who asked him just why he might be persona non grata with the ABA and Avins said it was because of his political beliefs. Avins is a strict constructionist, a Conservative and has written articles on the subject and the liberal law teachers and professors do not like him for it. He told us of some of the cases that he argued before the Supreme Court and the enmity that he has aroused on his stand on civil rights. He compared Delaware's problems with accreditation with a new law school in Washington, D.C., the name of which escapes me—it is affiliated with a non-Washington University, however. The library for this school is several blocks away from the school itself, and there are numerous other matters of inconvenience and problems. Nonetheless, since it is black-oriented, it got accredited. He also told of going to Fred Speaker, the former Attorney General of Pennsylvania, who is apparently now working for the Federal Government in one of the poverty programs. He asked about a grant of seed money to help get Delaware started and was refused. He also told us of a faculty job for which he was

(3) In paragraph 10 of his declaration of November 9, 1994, Mr. Avins referred to the fact that he deposed me in connection with his suit against James White. He states that the deposition dealt with this same meeting, that is, the meeting where he was "pressed" to resign. He is mistaken. Actually, the deposition dealt with a meeting of on or about August 20 that I attended in Judge DiBona's chambers. Mr. Avins was not present at all and there was no reference to Mr. Avins' resigning. These notes are contained in footnote 13. It is true, however, that approximately a week later my notes show that I talked with Judge DiBona by telephone and at that time he told me that he had separate meetings with Senator Steele, the trustees, some students, and with Mr. Avins and that at that point he believed Mr. Avins would resign gracefully.

(4) In his November, 1994 declaration, Mr. Avins is wrong when he lumps the Judges' Committee and the Parents' Association together and refers to them as the "Judges' Committee." Judge DiBona's deposition makes it very clear that there were two committees. Velvel Aff., Vol. I, ex. 14 at 74–75. He first organized the Judges' Committee in 1974 after the first ABA report and did so at Mr. Avins' request. *Id.* at 56. This was the committee of which I was a member. *Id.* at 57, 58, 64, & 65. After Judge DiBona returned from Hawaii, parents started coming to the meetings of the board of trustees and Judge DiBona then organized the "Parents' Association." *Id.* at 106, 107. According to Judge DiBona, this was the committee that involved "Alex Sarcione, Mitchell Milner, (sic) and myself [Judge DiBona], a lawyer over in New York,—Reidel's father-in-law." *Id.* at 142. The "Parents Association, D.L.S." issued a three-page newsletter that listed its officers, "Morris A. Paley, Esq., President, Bernard L. Les, M.D., Secretary,

[and] Alexander V. Sarcione, Treasurer." Velvel Aff., Vol. I, ex. 17 at 254–55.

(5) In paragraph 6 of his November, 1994, declaration, Mr. Avins states that he had many meetings with the members of the Judges' Committee, the members of the Judges' Committee were strongly in favor of meeting the "ABA's demands," and that the committee members repeatedly urged upon him that Delaware Law School should do what the ABA demanded. There is no hint in Mr. Avins' June, 1978, deposition that the Judges' Committee was strongly in favor of meeting the ABA's demands and that it urged him to do so. Mr. Avins does say he had "conversations" with "a couple of Judges and lawyers," who were parents of students. *Id.* ex. 15 at 74–75. He was specific about only two of them, a dinner meeting which I attended, where the subject of resignation did not come up although "at some point or other somebody raised the matter of my taking a leave of absence for a year. I don't recall the context." *Id.* at 76–77. This was the same dinner meeting referred to in subparagraph (2), p. 30, and footnote 16. After Judge DiBona's return from Hawaii, there was a second meeting, a luncheon with Judge DiBona, Judge Kirsch (sic), Judge Mirarchi, and "I think a couple of others". *Id.* at 78. Mr. Avins does not refer to me, to anyone's being "strongly in favor of meeting the ABA's demands for rectification of the alleged shortcomings of DLS," or that anyone "repeatedly urged upon [him] that DLS should do what the ABA demanded." Mr. Avins certainly knew my name when his deposition was taken on June 20, 1978, knew I was a federal judge in Philadelphia, and knew I had taken notes. Mr. Avins was able to remember the names of students who attended one of his meetings. *Id.* at 80. In his deposition, Mr. Avins makes only one reference that could remotely suggest that he was "urged" or "pressed" to do anything—a different meeting he had with Dr.

---

an applicant—he had talked to the Dean of the school and seemed to be all lined up, even to the point of talking about which office he would occupy—then, the Dean talked to some people who knew Avins and must have gotten an earful because the Dean would not even talk to Avins at the meeting (a convention of law school teach-

ers) thereafter. Needless to say, he did not get the job.

In other words, as Avins tells it, he is being discriminated against.

The thing that impressed me about the meeting was the fact that Avins seemed very willing to follow our suggestions.

Moll.[17] At that meeting, Dr. Moll said it was "absolutely necessary to affiliate the Delaware Law School with Widener to get accredited." *Id.* at 207.

Mr. Avins' 1994 declaration is not only at variance with his own deposition but is at variance with Judge DiBona's deposition and testimony. As I have previously pointed out, there are eight pages in Judge DiBona's 116 page deposition on which reference is made to the Judges' Committee he formed. I am named on four of those pages. On pages 64 and 65 Judge DiBona refers to the meeting that started in his office and ended up at a restaurant. Judge DiBona makes these separate occasions, while my notes show it was all one. In any event, it is plain that Judge DiBona was referring to events that took place before he went to Hawaii. The only other reference to the committee and Mr. Avins appears on page 58 where Judge DiBona says that he went to Hawaii in August of 1974 and that prior to August of 1974 the committee had many meetings with Mr. Avins. Judge DiBona says that during those meetings, there were discussions concerning the law school's problems and an effort to explore the ways that help could be provided to the law school. Velvel aff., ex. 14, at 58-59. There is no reference to urging Mr. Avins to "do what the ABA demanded" or "pressing" Mr. Avins to do anything. There is no reference to any meeting of the Judges' Committee with Mr. Avins after Judge DiBona returned from Hawaii and as Mr. Avins stated in his deposition, page 75, he did not discuss the possibility of resigning with Judge DiBona before Judge DiBona came back from Hawaii.

(6) In paragraph 10 of his November, 1994, declaration, Mr. Avins refers to the deposition I gave. He says that it "dealt in significant part with the meeting at which members of the Judges' Committee pressed [him] to resign...." As I have previously pointed out, the subject of my deposition and the notes I relied upon dealt with a meeting that took place on or about August 20, 1974. He is wrong again. Mr. Avins was not present at that meeting and my contemporaneous recollection of it is recorded in footnote 13. Mr. Avins' November 1994 declaration is not only wrong about the time of the meeting, his presence at the meeting, and what was discussed, but is also at variance with the questions he asked at my deposition. At no point did any of his questions suggest he had been present or a belief on his part that I had ever urged him, pressed upon him, or even discussed with him, his complying with what he now calls the ABA demands.

(7) Mr. Avins is wrong about one more point. In paragraph 7 of his November, 1994, declaration, he states that members of the Judges' Committee, "including Judge Ditter," met with ABA accreditors during inspection functions [plural]. He named James White as being one of those accreditors. During my deposition, he told me Millard Rudd was the other. I have no present recollection of ever meeting with any ABA accreditors or attending any inspection functions. However, in my January 31, 1977, deposition I state that I did attend one cocktail party in January, 1974, that was given in connection with an accreditation inspection. I make it equally clear in that deposition that it was the one and only "inspection function" that I ever attended and that I had no recollection at that time of the names, Millard Rudd or James White. This is what I said in that deposition: [18]

Q. [by Alfred Avins] Alright. Do you recall whether Judge DiBona discussed with you any conversations he had with Professor Millard Rudd, former consultant to the American Bar Association?

A. Well, may I pose a question to you. I was at an open house during a period of inspection at the Delaware Law School. Would that have been in the spring of '74?

Q. January 15, 1974.

A. Then perhaps was Professor Rudd, is it Rudd?

Q. Both Professor Rudd and White were both there, yes.

---

17. Clarence R. Moll was then the president of Widener University.

18. On December 6, 1994, my secretary transcribed my deposition from a cassette I recorded when I was deposed.

A. I talked to either one or both of those gentlemen at that time and I would suspect, although I don't have any recollection of it, that in my conversations with Judge DiBona, certainly things may have been said about a conversation that he may have had with them at that time.

Q. Do you recall anything about your conversations with one of the inspectors in January, 1974? There was a cocktail party in the library of the Law School. Is that right?

A. Yes sir.

Q. And do you recall anything about your conversations?

A. Not the details of it except as I recall it, we tried to observe how much progress had been made so far as the law school was concerned in a very short time. I don't remember this inspector, whichever one it was and it may have been both, I don't remember that they said anything derogatory, I don't remember that they said anything committal though either. I think that we felt, I felt, I better speak for myself, I felt that the law school had made tremendous progress, I was able to see there first hand what had been done so far as the library was concerned.... I suspect that I probably said something along that line about what a magnificent job had been done here starting from nothing to build a law library like this.... Now, other than that I don't remember any conversation. (pages 3–4)

Q. Do you remember any incident in respect to Professor Rudd and a female student at that cocktail party?

A. No.... (page 4)

Q. Do you recall whether Judge DiBona ever mentioned a telephone conversation with Professor Rudd or Rude during that period of time?

A. I do not recall such a conversation.... (page 4)

Q. Did there come a time subsequent to the return of Judge DiBona when—return from Honolulu—did you have any conversations with Judge DiBona or hear any conversations or any discussion by him as to any findings that he had found in Honolulu?

A. Yes.

Q. And you have some notes of these conversations with you?

A. Yes.

Q. Let me ask you specifically certain points in addition to, I understand that you will give counsel copies of the notes. Did Judge DiBona say whether he had discussed the Delaware Law School with all the members or some of the members or most of the members of the Council of Legal Education Admissions to the Bar and its Accreditation Committee?

A. I do not recall that there was any identification of the individuals or the groups with whom he had spoken. There may have been, I just don't know.

Q. Do you recall whether Judge DiBona had any conversation—I'm sorry, strike that. Do you recall whether Judge DiBona stated that he had discussed the Delaware Law School with Professor James White, the consultant on legal education?

A. My notes do not reflect that but it is entirely possible that he said he had. I just don't recall.... (pages 7–8)

Q. Are there any other—anything else that you can remember about any conversations other than what you testified to regarding things that Judge DiBona said or Professor White said with respect to my being fired as the dean or a member of the board of trustees of the Delaware Law School?

A. I think I said I don't recall ever having talked with Professor White. I don't ever recall having talked with him at all. The only time that I could have possibly talked to him that I can think of would have been at that cocktail party at the Delaware Law School in the spring of '74.

Q. He could have been there in January, 1975, when he returned. There was a party at Dean Weeks' house.

A. I was never at Dean Weeks' house.

Q. Okay.

A. I can only recall one social activity at the law school. Now I was at the law school on Law Day and spoke to the stu-

dents and I think there was socializing after that.

Q. That was in 1974. I was still the dean.

A. You were still the dean. Judge Di-Bona was on the platform and I was on the platform. We both spoke—I think it was Law Day—I don't know that I would ever have met Professor White at all. So far as other conversations with Judge DiBona. I'm sure there were others and you have seen my notes and I will show them to you again. These notes reflect that there were other conversations.... (pages 14–15)

Atty. for dft: I have a few questions, your honor. You have alleged that you don't believe that you ever met Dean White and ever spoke to him except perhaps at a cocktail party?

A. That's my recollection.

Q. Do you ever recall seeing anything written by Dean White that may have reflected or been critical of Mr. Avins' political views?

A. No.

Q. Do you have any reason to believe that Dean White at any time did not conscientiously undertake to investigate the desirability of accrediting Delaware Law School.

A. No.

Q. Do you have any reason to believe that political views interfered or weighed in Dean White's activities in examining the school's qualifications?

A. No.

Q. Finally, have you read or heard any statements of Dean White that were slanderous or libelous to the plaintiff?

A. No.

Q. That's all I have to say.

Dean Avins: Thank you very much judge. (pages 15–16)

My own notes contradict Mr. Avins' assertion that we met on many occasions. According to my notes, we met once during the period 1974–75. It was on July 31, 1974, and my notes of that meeting are contained in footnote 16. I have no other present recollection of seeing Mr. Avins. However, in the deposition that I gave on January 31, 1977, I state that in January, 1974, I attended a cocktail party that was given in connection with an inspection of the law school and that on Law Day, 1974, I was on the platform with Judge DiBona and that I spoke to the students. It would be highly probable that I met Mr. Avins on both of those occasions.

Finally, my notes contradict Mr. Avins' statement that I urged him or pressed him to do anything. Quite to the contrary, my notes show that on September 4, 1974, I expressed to Judges DiBona and Mirarchi, and to Mr. Peruto, "my horror that the possibility existed" that Mr. Avins was being forced out for political reasons. I discussed that same concern again with Judge Mirarchi by phone on September 5 and with Judge Hirsch when we spoke by phone later that same day.

For the reasons stated, I reject as erroneous the following statements from the declaration of Alfred Avins:

(1) The Judges' Committee and the Parents' Committee of Delaware Law School were combined and could accurately be referred to as the "Judges' Committee."

(2) I met Mr. Avins on many occasions.

(3) I was "strongly in favor of meeting the ABA's demands for rectification of the alleged shortcomings of DLS."

(4) I "repeatedly urged" that Delaware Law School should do what the ABA demanded.

(5) I met with ABA accreditors on more than one occasion.

(6) I urged Mr. Avins to "step down from the deanship" and that this matter "was pressed" on him at a meeting that began in Judge DiBona's chambers and was continued at Luigi's restaurant.

(7) The deposition that I gave on January 31, 1977, dealt with a meeting of the Judges' Committee at which Mr. Avins was "pressed" to resign.

One more thing, Mr. Avins' declaration of November, 1994 is fundamentally misleading in the way it lumps together all of what he now calls the ABA's "demands." It is apparent from reading Judge DiBona's deposition

that it was his purpose to treat each of the ABA's objections separately and to see what could be done to solve them individually.[19]

Perhaps it is unnecessary for me to do so but, in order that the record be clear and explicit, my activities on the Judges' Committee consisted of briefly meeting with Judge DiBona on March 21, April 25, July 30, and 31, August 6, 16, on or about 20, and September 4, in addition to which I had telephone conversations with Mitchell Miller, Esquire, on September 4, with Judge DiBona on August 27, and with Judge Mirarchi and Judge Hirsch on September 5.

That was it.

That is not only what my notes show, but what Judge DiBona's deposition and testimony show. When relating his activities after his return from Hawaii, Judge DiBona says "I." He does not refer to the Judge's Committee, intimate that it did anything, or say it assisted him in any way. He talks about the things *he* did.

So far as I am concerned, there is nothing in Judge DiBona's extensive testimony about his meetings, activities, or efforts after he returned from Hawaii to suggest I took any part in anything he did at the Delaware Law School.

Again, so the record is clear:

I did not organize either the Judges' Committee, the Parents' Association D.L.S., or any other group intended to work toward getting the Delaware Law School accredited. I did not talk with any representative of the Delaware Bar about the Delaware Law School. So far as I know, I never met with, talked with, or corresponded in any way with James P. White, Millard Rudd, Arthur A. Weeks, or any person named as a defendant by MSL in this suit. Mr. White's name meant nothing to me when I was deposed in 1977 and means nothing to me now.

I never urged Alfred Avins to resign, step down from his position as dean, or pressed him to do so.

I never read any accreditation report, although I saw one when I met with Judges DiBona and Hirsh and with A. Charles Peruto, Esquire, on July 30, 1974.

I did not attend ABA accreditation functions, although I did attend one cocktail party in January, 1974.

I did not attend any meeting that involved Delaware Law School students. On September 4, there were students present when I went to Judge DiBona's chambers but at my request they were excused from the meeting.

I never met with the "Parents' Association, D.L.S.," never gave it any money, or participated in any of its activities.

So far as I know, I never met with any member of the faculty at the Delaware Law School or evaluated it, formally or informally.

I did not attend any ABA meetings, any ABA committee meetings, or ABA counsel meetings for the purpose of obtaining information about the Delaware Law School or presenting my views concerning the school. For that matter, as I said in my letter of January 6, 1994, to counsel in this case, I have never attended any ABA meetings.

I never attended any meeting of the board of trustees of the Delaware Law School or met any of its members. My only contact with any member of the board of trustees resulted from a phone call from Judge Stefan before he became a member.

I took no part in any negotiation that led to the affiliation of Delaware Law School with Widener College.

I took no part in the selection of Arthur A. Weeks to become the dean at Delaware Law School.

I took no part in the efforts of then Dean Weeks to obtain accreditation for Delaware Law School.

I was not proposed for membership on the board of trustees of Delaware Law School. I did not attend the 1975 mid-year meeting in Chicago of the ABA. I did not make a contribution to any fund intended to be used to help attain accreditation for Delaware Law school. I did not offer to pay for the alteration of a room at the Delaware Law School. I provided no money to help defray the ex-

---

**19.** Velvel aff., ex. 14 at 75–75, 77, 115, 151–152.

penses of Judge DiBona's trip to Hawaii, the expenses of the Parents' Association, or the expenses of the students.

Other than normal conversations that I may have had with my own son, and perhaps one of his friends, I had no meetings or conversations with any students concerning accreditation or how it would be achieved.

Although Judge DiBona may have gone to the law school on 31 consecutive evenings and may have spent a couple of thousand hours on the activities of the Delaware Law School, I did neither. I can recall no visits to the Delaware Law School at this time, although my deposition shows that I was there on two occasions. I have few recollections of the Delaware Law School, and what I knew then, I learned from Judge DiBona.

In summary, there was nothing that I did or said 20 years ago in connection with the Delaware Law School that would create any appearance of partiality in this case.

### III. My Alleged Falsehood

Plaintiff also contends that I lied when I stated in my letter of January 6, 1994, that the issues in this case were ones about which I have never before thought. This is what that letter said:

To All Counsel:

As was the case with many young lawyers at the time shortly after my graduation from law school in 1948, I joined the American Bar Association. More or less by habit, I continued my membership. In 1992, I decided not to pay any further dues and to permit my membership to expire. Despite several reminders from the ABA, I paid no dues in 1993 and do not intend to renew my membership. This decision had nothing to do with any of the issues that are involved in this case, issues about which I had never thought until this suit was brought.

I have never held any office in the ABA, never served on any of the committees, and so far as I can recall, never attended any of its meetings.

If you think that this case should be assigned to another judge, please make that fact known to the Clerk of Court. He in turn will discuss it with the Chief Judge, and I will not be informed as to the source of any such communication.

### A. *The Charge That I Lied*

I am not overreacting when I say that I am accused of deliberate falsification. Plaintiff in the affidavit filed by Mr. Velvel and in its motion makes the nature of the charge abundantly clear. This is what Mr. Velvel says:

¶ 4(a) "Near the very inception of the case, for the expressed purpose of asking the parties whether his continuation in the case should be barred by certain extrajudicial facts, Judge Ditter notified MSL and the defendants of facts concerning his membership in the ABA ... But Judge Ditter did *not* notify MSL of two other highly pertinent sets of extrajudicial facts ... which *were* relevant to disqualification." Velvel Aff. at 2 (Emphasis in original).

¶ 5(a) "First, Judge Ditter failed to notify MSL of his role in a major imbroglio centering about the ultimately successful efforts to obtain accreditation for an unaccredited law school attended by his son ... [that] took the form of acceding to anticompetitive ABA demands instead of challenging those demands as MSL has done...." *Id.* at 3–4.[20]

(b) "The imbroglio over DLS, in which Judge Ditter played a role, was no small or forgettable matter.... Judge Ditter's failure to notify MSL of his role in the prominent controversy involving many of the same anticompetitive attacks as made by defendants on MSL, a controversy on whose successful resolution his own son's professional future depended, thwarted the Supreme Court's injunction in *Liljeberg* that a judge should 'carefully examine possible grounds for disqualification and ... promptly disclose [to parties] when discovered'...." *Id.* at 4–5.

¶ 6.(a) "Until very recently ... MSL had no knowledge whatsoever of Judge Ditter's

---

**20.** The second fact to which Velvel refers is my membership on the Board of Consultors, Villano-va School of Law, to which I will refer in Section IV.

role with regard to the embattled unaccredited DLS ... or of the ineluctable truth that Judge Ditter learned extrajudicially of facts and *purported* facts regarding ABA accreditation and James White when the Judge played a role in the DLS accreditation embroglio...." *Id.* at 5.

(b) "Rather than MSL having any knowledge of these matters or being notified of any of them by Judge Ditter, in his January 6, 1994 letter to the parties Judge Ditter said that the issues 'that are involved in this case [are ones] about which I have never thought until this suit was brought....'" *Id.* at 5–6.

(e) "Based on the relevant facts of the DLS situation, Judge Ditter should have recused himself under 28 U.S.C. § 455(a)...." *Id.* at 6.

¶ 11. "Shortly after MSL's case was filed, Judge Ditter sent the parties a letter stating that he had joined the ABA in 1948 upon his graduation from law school, but had been an inactive member who rarely attended meetings [21] and who dropped his membership in 1992." *Id.* at 10.

¶ 13. "Though he notified MSL of extrajudicial facts regarding ABA membership that were plainly irrelevant to a decision to seek disqualification, Judge Ditter did not notify MSL of highly pertinent facts regarding his involvement in the imbroglio over, or regarding the attendance of his son at, the unaccredited, unaffiliated Delaware Law School.... Students and their parents alike were forming committees, holding meetings and expressing concerns, and some people even resorted to physical threats ... Many of the parents at unaccredited DLS were lawyers and judges ... Judge Ditter, in particular, was one of the most active members of a committee of judges." *Id.* at 12.

¶ 16. (h) "... two new trustees were added to the DLS board. One was Judge Louis Stefan, a judge of the Montgomery County, Pennsylvania Court of Common Pleas ... on which Judge Ditter had sat from 1964 to 1970.... Judge Stefan was a 'close friend' of Judge Ditter, and consulted Judge Ditter before joining the Board of Trustees." *Id.* at 19.[22]

¶ 17. "The underlying events concerning DLS are also detailed in judicial records. These records make clear, among other things, that Judge Ditter was a leading member of the Judges' Committee of DLS, whose express purpose was to assist DLS in becoming accredited; that he participated in discussions with co-members and others about changes desired at DLS by the ABA; that, although Judge Ditter said in his letter of January 6, 1994 that the issues in this case are ones he never thought about previously, in the DLS situation the accreditors, particularly James White, levelled against the unaccredited DLS many of the same charges and enforced against DLS many of the same anticompetitive criteria that the accreditors, led by the same White, are now levelling against and enforcing against the unaccredited MSL ... that Judge Ditter was deposed by Avins and the deposition was played to a jury in a lawsuit Avins brought against White...." *Id.* at 24–25.

(a) "Although Judge Ditter said in his letter of January 6, 1994 that 'the issues that are involved in this case [are ones] about which I had never thought until this suit was brought,' the deficiency letter written by James White and Millard Rudd after they inspected DLS in January 1974 shows that they levelled many of the same anticompetitive criticisms and charges at DLS ... as White and company have wrongly leveled against MSL and that are involved in this case...." *Id.* at 25.

(b) "... there was a committee of judges who had sons at DLS, that Judge Ditter was one of the most active of these judges, and that the committee had many meetings ..." *Id.* at 27.

---

**21.** Inadvertently Mr. Velvel has misquoted me, and thus left open the possibility that I may have met with ABA representatives about Delaware Law School in some way or other. What I said was that so far as I could remember I had *never* attended an ABA meeting.

**22.** As I am sure Mr. Velvel meant to add, Judge Stefan's deposition shows he was contacted by Alfred Avins, dean of Delaware Law School, who asked him to join the trustees. It was Dean Avins who suggested Judge Stefan talk to me, and my records show that when Judge Stefan called, I added my request to that of Mr. Avins.

(d) "The deposition of Alfred Avins ... showed ... that Judge Ditter had made notes of a dinner meeting in Philadelphia, and that James White said that affiliation with a university was crucial for DLS to receive accreditation...." *Id.* at 31.[23]

(g) "The deposition of Richard Plechner in *Avins v. Widener College* ... showed ... that the accreditors told Federal District Judge Hannum, one of Judge Ditter's colleagues on this Court, that affiliation was essential for accreditation...." *Id.* at 39.

¶ 18(b) "Concerned DLS parents, including judges, were very worried. Their decision, unlike MSL's, was to adhere to anticompetitive ABA requirements, *not* to challenge them. As a result, DLS received accreditation. And, as can hardly have escaped a judge who was involved in relevant events, whose son graduated from DLS, and who sits in Philadelphia, only a relatively brief car ride from each of the current two campuses of DLS (which is now called Widener Law School) accreditation was the springboard for DLS to go from strength to strength. It has grown to be one of the largest law schools in the country (by some measures *the* largest), with two campuses, over 2,000 students, numerous foreign programs, and a host of graduates practicing in this area, including graduates practicing before this Court." *Id.* at 44.

(d) "Judge Ditter's failure to notify MSL of his own role in the DLS situation, and to notify it that his own son had gone through the experience at DLS, precluded MSL from even asking questions which fairly shout from that situation and from even considering whether to seek recusal because of the situation.... Judge Ditter's failure to notify MSL was contrary to the Supreme Court's admonition, quoted above, that a judge should 'more carefully examine possible grounds for disqualification and ... promptly disclose them when discovered.'" *Id.* at 45.

¶ 36. "As stated above, Judge Ditter failed to notify MSL ... of his involvement in the imbroglio involving the unaccredited, unaffiliated Delaware Law School—an imbroglio involving James White and a law school which Judge Ditter's son was attending while the Judge sought its accreditation...." *Id.* at 67.

Finally, Note 8 of plaintiff's reply memorandum in further support of its motion for my disqualification refers to my letter of January 6, 1994, and my statement that I had never thought of the issues in this case, plaintiff states, "The record now reveals that, based upon Judge Ditter's involvement with DLS, the issues in this case are, in fact, ones familiar to Judge Ditter."

So there is no misunderstanding, I will state this explicitly: at no time during my handling of any facet of the Massachusetts School of Law case did it bring to mind the Delaware Law School and my interest in its accreditation.

**B.** *Plaintiff's Complaint Presented the Issues*

The issues in the present case are outlined in plaintiff's complaint:

Paragraph 1 states that this case involves violations of the anti-trust laws by the defendants.

Paragraphs 11 through 15 allege that while tuition costs are kept at a reasonable level, plaintiff offers high-quality legal education through innovative techniques and a faculty of proven practitioners, who have demonstrated their teaching abilities.

Paragraph 16 asserts plaintiff's board of trustees are "five prominent lawyers and civically minded individuals."

Paragraphs 19 through 26 allege that the ABA has monopoly power because 42 jurisdictions in the United States require graduation from an ABA accredited law school as a

---

**23.** Inadvertently Mr. Velvel has combined portions of Mr. Avin's deposition in such a way that the casual reader might conclude that Mr. Avins said James White and University affiliation were discussed at the dinner meeting. Such an inference would be erroneous. Mr. Avins talked about the dinner meeting and my notes at pp. 75–77. There is no mention of James White, Dr.

Clarence, R. Moll, or the possibility of affiliation with the University. However, at pp. 206–07, Mr. Avins speaks of a "luncheon with Moll," who said, "it was absolutely necessary to affiliate the Delaware Law School with Widener to get accredited." That information came "from White and some other A.B.A. officials."

prerequisite for the taking of bar exams, the details of the ABA's policies, and the details concerning the ABA's refusal to accredit the plaintiff.

Paragraph 27 alleges that although MSL satisfies most of the ABA's criteria, accreditation has been denied because MSL refuses to comply with criteria it considers anti-competitive. Paragraph 28 adds "because MSL had publicly and actively opposed the ABA's anti-competitive criteria, MSL specifically sought to be accredited by the ABA pursuant to Standard 802, which in part provides that: 'A law school proposing to offer a program of legal education contrary to the terms of the Standards apply to the Counsel for a variance.' Such a variance has been denied to MSL."

Paragraph 37 alleges that the ABA's criteria have harmed MSL, its students, and the public, while paragraph 38 alleges that the defendants have received personal benefits from the criteria and the associated suppression of competition.

Paragraphs 39–41 allege that the ABA has abused its monopoly power in the accreditation field, made clear it will not accredit MSL as long as it does not conform to the ABA criteria, and has thereby caused injury to MSL. Paragraphs 42 through 49 allege violations of sections one and two of the Sherman Act and are followed with a demand for judgment for treble damages, prejudgment interest, costs, reasonable attorneys' fees, and further relief.

In summary, the complaint alleges plaintiff is a quality, innovative law school that actively opposes compliance with the ABA's "anti-competitive" standards. Because the ABA refused accreditation on plaintiff's terms, plaintiff seeks treble damages and counsel fees from organizational and individual defendants. There is no prayer in the complaint that the ABA be required to grant accreditation.

### C. *My Understanding of the Issues*

When I read the complaint, I considered the major issues it presented to be:

(1) Is it possible to impose standards on educational institutions that do not limit competition?

(2) Are the antitrust laws violated when standards are imposed on schools that provide professional education?

(3) Do the standards imposed on law schools by the ABA as the price of accreditation violate the antitrust laws?

(4) Is actionable monopoly power created when a large majority of states voluntarily endorse a professional organization's educational standards?

(5) Can a school which voluntarily refuses to comply with educational standards obtain damages for the harm it thereby suffers?

I may not have framed those questions in the way I have spelled them out here, and I confess that I did not write them down at the time. All I knew was that I had never had an antitrust case involving educational standards, nor any particular reason to think of the legal questions that educational standards create.

### D. *Why the Issues Did Not Invite Attention to The Delaware Law School*

The complaint in this case did not bring the Delaware Law School to mind—and for good reason. The Delaware Law School matter involved events of 20 years ago. My participation in them was limited and did not require legal analysis. My concerns were those of a parent, not those of a judge or lawyer. Other than being deposed in early 1977, I have had little or no reason to think about the Delaware Law School's accreditation problems.

MSL allegations about itself were not such that they would be a reminder of the Delaware Law School. MSL asserts it provides high quality education for a reasonable price. Basing his information on judicial opinions, court records, and the media, Mr. Velvel himself described the Delaware Law School as a "schlockshop" that had "horrendous inadequacies" and suffered from the "asserted shortcomings of its founder." Velvel Aff. at 13. Had I been asked 20 years after the fact to describe the Delaware Law School without resorting to a means to refresh my recollec-

tion about the things I had heard from Judge DiBona, I doubt that I have used Mr. Velvel's vibrant words and to the contrary would have only recalled that the school suffered from birth pangs and that its problems were worked out by others well before it came time for my son to graduate.

There is another reason why the MSL complaint did not bring the Delaware Law School to mind: the Delaware Law School did not involve a suit for money damages but was an effort by concerned persons to obtain accreditation so that its students could become lawyers. MSL actively opposes the ABA's criteria; the Delaware Law School wound up doing just the opposite. I am not suggesting that one approach is right and the other is wrong, but merely explaining why I now believe plaintiff's complaint did not bring the events of the Delaware Law School to mind when I read it.

Finally, the MSL complaint charges a long history of wide-ranging conspiracies by organizations and individuals in violation of the antitrust laws. No similar charges were leveled during the efforts to obtain accreditation at the Delaware Law School.

If someone had prompted me a bit, would I have recalled my eight meetings with Judge DiBona? I probably would have remembered that there were such meetings, for it was the only time our paths ever crossed, but the notes I dictated to my secretary in 1974 about those meetings barely ripple the cauldron of memory. What do I recall about the dinner meeting with Mr. Avins at Luigi's? Only that it took place and that Mr. Peruto, who has appeared before me on several occasions, had what I believe was a sports car and dropped me off at the Reading Terminal. Can I explain why I remember the trivial and must rely on my notes for the rest? No more than can, I daresay, Mr. Avins explain why he obviously is confusing this meeting in which I did participate and which took place before Judge DiBona went to Hawaii with an event in which I did not participate and one that could only have occurred after Judge DiBona returned. All these are matters for psychologists to explain—what I know is that I spoke truthfully when I said the issues in this case were ones about which I had never thought.

I reject Mr. Velvel's contention that I lied when I said, on January 6, 1994, that I had never considered the issues in this case, that any reasonable person who has read the record would conclude I had done so, and that my letter forms any basis for questioning my impartiality.

## IV. VILLANOVA UNIVERSITY LAW SCHOOL BOARD OF CONSULTORS

 Mr. Velvel advances a third reason why an objective person would question my impartiality: I failed to notify MSL directly of two facts that its own attorney knew— first, that I am a member of the Board of Consultors of Villanova Law School, and second, that in early April of this year, Villanova's dean, Steven Frankino, sent me materials about a scheduled ABA reaccreditation inspection.

Harold Kohn, Esquire, who signed the complaint in this matter, is a member of the Villanova Law School Board of Consultors.[24] Since 1977 I too have been a member of the same Board, a fact of which Mr. Kohn is aware. In early April of this year, Dean Frankino sent to me, and I assume to all Consultors, material that he said would deal with the next Villanova ABA inspection. Without reading any of the documents, I returned them to Dean Frankino immediately by letter dated April 5. Mr. Kohn apparently received the same information that had been sent to me and he thoughtfully wrote to me on April 11 suggesting I should not attend the next Consultors' meeting because it would deal with accreditation. In response, I sent Mr. Kohn a copy of my letter to Dean Frankino and heard no more about the matter.

Mr. Velvel sets forth these facts in his affidavit, but maintains that if I had notified MSL itself of my membership on the Board, "(as [I] should have)," or if I had notified MSL "*ab initio*" of the receipt of the materi-

---

24. Mr. Kohn became a member in 1971 according to *Martindale–Hubbell*. He and I have seen each other at many of the Board's biannual meetings.

als "(as [I] should have)," MSL would have been alerted "to the possibility that something might be amiss" and would have asked me "about pertinent questions"—specifically:

(a) How did I come to the Board of Consultors?

(b) Which meetings that I attended dealt with ABA accreditation?

(c) What contacts have I had with the Villanova administration outside of Board meetings? and

(d) What contacts have I had with Villanova administrators who have themselves been leading ABA accreditors or are closely tied in with ABA accreditors?

Actually, Mr. Kohn can answer the first two questions. Since he was a member of the Consultors for six years before I was invited to join, he would know what was said about me before hand. I am sure that Mr. Kohn gets a copy of the minutes of all board meetings. What was discussed and whether I was present can be readily ascertained in that manner.

I doubt that anyone can answer the next two questions—certainly I cannot. I do not know who would come within the term "Villanova administration," what would constitute a "contact," or when the calendar begins to run. However, I can assure plaintiff that no Villanova Administrator has ever sidled up to me at a Consultors meeting, or anywhere else, and told me on the QT that he was tied, closely or loosely, to one or more ABA accreditors—nor have I ever asked a question about such ties, not that I know what it means to be "closely tied" to an ABA accreditor, whoever that may mean. And no Villanova administrator has revealed to me that he is, was, or expects to be a "leading" ABA accreditor, which I suppose is different than a non-leading ABA accreditor.

Quite apart from the indefinite nature of those questions, however, I conclude there is no merit to plaintiff's contention for three reasons:

First: Mr. Kohn's knowledge of my membership on the Board and his knowledge that I had received unsolicited material from Dean Frankino is attributed to MSL. There are more than 60 federal cases available

through a *Westlaw* search dealing with the matter. Perhaps the leading one is *Link v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). There are also cases from the First and Third Circuits. For example, *Levin v. Berley*, 728 F.2d 551, 553 (1st Cir.1984), in ruling on a case from the District of Massachusetts and citing Massachusetts authority, holds that a client is charged with the knowledge of his attorney. *United States v. Everett*, 700 F.2d 900 (3rd Cir.1983), is to the same effect. The cases are collected under key number 104, Attorney and Client, in the various *West's* digests and can also be found in *Corpus Juris Secundum*. I accept, of course, that Mr. Velvel's failure to note this rather elementary principle of law was a good faith omission on his part resulting from some computer glitch or foul up.

Second, I have been unable to find any case that even suggests a judge should bypass counsel and notify a client directly of anything, much less a case holding that the judge's failure to do so somehow should be taken as an indicator of partiality.

Third, Harold Kohn is one of the leaders of the antitrust bar. He enjoys a national reputation as an outstanding litigator and counsellor. Had I taken it upon myself to contact MSL directly it could only have been interpreted as a suggestion that I felt Mr. Kohn was doing such an inadequate job in representing MSL that basic fairness required my replacing his judgment with mine. I cannot even imagine what circumstances in this case would have justified my driving a wedge between Mr. Kohn and his client by creating such an aura of distrust.

I reject plaintiff's contention that my failure to notify it directly of my membership on the Villanova Board of Consultors and my failing to tell plaintiff of my receipt of material from Villanova's dean could be taken by a reasonable observer as an indication of partiality.

## V. The Rulings in this Case

 Finally, plaintiff contends that coupled with my failure to disclose my participation in the Delaware Law School "embroglio" and my failure to disclose to plaintiff

directly my membership on the Villanova Law School Board of Consultors, I have "taken a host of intrajudicial actions that flouted established principles of law and nearly crippled MSL's ability to pursue its case effectively." Velvel aff. at 49. Mr. Velvel contends that these actions themselves reflect apparent partiality against MSL and in favor of the ABA.

Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. Nevertheless, I shall explain the bases for those rulings.

Eighty-eight years ago, Dean Roscoe Pound decried the notion that a judge should be a "mere umpire" who lets the parties go their merry way, viewing a law suit as though it was a game. In the ensuing years, many judges and lawyers agreed that litigation should not be treated like a joust, where there are no rules, and the silk scarf goes to he who can best bluff, bluster, bludgeon, and bully. They have answered Dean Pound's challenge by developing procedures to resolve litigation in as just, speedy, and inexpensive manner as possible without a loss of the protection afforded by the adversarial system. Over my years as a federal judge I have attended a fair number of conferences, seminars, training sessions, and workshops. I have been privileged to hear practitioners and professors, judges and justices, legislators and layman—and through all there has been a common thread: litigation costs too much, takes too long, and rewards the undeserving. We are admonished to do something about it.

Toward this end, I tried in this case to identify the issues that could be pursued initially and the type of discovery that they would involve. From limited research, I learned the Supreme Court has been reluctant to denounce as unreasonable *per se* the rules adopted by professional associations. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). It seemed to me that the educational standards adopted by the ABA should therefore not be condemned out of hand and to the contrary, should be analyzed on the basis of the rule of reason. *Weiss v. York Hosp.,* 745

F.2d 786, 821 n. 60 (3d Cir.1984). Accordingly, at one of my early meetings with counsel, I asked them to submit to me a joint proposal addressing the rule of reason in the context of this case. My purpose was to clarify and narrow the issues. I make no apology for my statement that I wanted the rule of reason explored before counsel became "involved in a long and protracted and what I would assume would be a very expensive discovery." Velvel Aff. at 54. Indeed, it was "my intention that this memorandum and order will ... *call* [the parties] away from the lure of abusive inquisition, and free third-parties from the burden of discovery that may never be required." *Id.* at 56. (Emphasis added by Mr. Velvel). I reject now, as I did at the time I made those statements, the notion that the filing of a broad, wide-ranging, multi-defendant complaint crammed full of legalese and jargon is a ticket that automatically entitles the holder to "full discovery ...., which is normal in an antitrust case." In making rulings of this type, I was merely trying to carry out the suggestions contained in the *Manual for Complex Litigation, 2d,* Section 21.31. It is a fundamental clash in approach that is at the heart of plaintiff's dissatisfaction with my rulings: its apparent belief that discovery should be global, intimidating, and comprehensive, and my belief that initial discovery, at least, should be selective, focused on identified issues, and be reasonably calculated to lead to admissible evidence concerning them.

Mr. Velvel's affidavit lists several of my rulings as being indicative of my bias and prejudice. *Id.* at 48–52. In its petition for a writ of mandamus to the Third Circuit, plaintiff recast some of those reasons. Therefore, I shall consider them initially and then return to Mr. Velvel's other concerns.

**A. Faculty Salaries**

One of the ABA's accreditation criteria deals with faculty salaries. MSL contends that my bias against it is further shown by the fact that as an initial matter I refused to permit unlimited, unfettered discovery as to faculty salaries in all 177 ABA accredited law

schools.[25]

As I have previously explained, I made a preliminary determination that discovery should be directed toward certain issues in this case. Specifically, I held that discovery should focus on the ABA accreditation criteria challenged in plaintiff's complaint and that for each of those criteria discovery should be directed toward providing those facts which would enable a rule of reason analysis to be made. As to each challenged criteria, I directed that discovery should focus on the following areas:

(1) Does the standard have an anticompetitive effect;

(2) Are redeeming virtues claimed for the standard; and

(3) Is there a way to achieve the redeeming virtue that would be less restrictive of competition?

Plaintiff contends that the limitations I imposed on discovery indicated my hope that "the procedure would enable [me] to dismiss plaintiff's case early-on, without allowing MSL the full discovery to which it is entitled under the federal antitrust laws and the Federal Rules of Civil Procedure, and without allowing the jury issues to be heard and decided by a jury." Velvel Aff. at 54. To make his point clear, Mr. Velvel went on to say that I reaffirmed my "hope of getting rid of MSL by deciding questions that are for the jury and by doing so without allowing MSL necessary discovery." Velvel Aff. at 60.

Mr. Velvel's concern is directed at my order of May 20, 1994, reported under the caption of this case at 853 F.Supp. 837, and my order of July 20, 1994, reported at 857 F.Supp. 455. In the memoranda that accompanied these orders, I thought I made it perfectly clear I was making *initial* determinations about discovery.

In the former memoranda, this is what I said:

"I met with counsel to discuss the preliminary issues in this case and told them to submit a joint proposal or, if that was impossible, separate proposals, addressing the rule of reason and the allegation of concerted action. My purpose of telling the parties to respond to specific questions was to have them move beyond the all encompassing allegations of the complaint and to come to grips with the legal issues that need to be determined initially.... It is my intention that this memorandum and order will set the parties to the immediate task at hand, call them away from the allure of abusive inquisition, and free third-parties from the burdens of discovery that may never be required....

"It is not my purpose to limit discovery within the framework of the rule of reason, but rather to eliminate, for the time being, any other discovery."

Both plaintiff and defendant sought alterations of the order of May 20, 1994. The ABA contended that discovery should only pertain to those criteria which it applied in denying accreditation to MSL rather than all of the criteria mentioned in MSL's complaint. The ABA specifically pointed to the fact that the letter denying accreditation to MSL made no reference to certain criteria challenged in MSL's complaint—including, Standard 405(a) which deals with faculty salaries. The ABA's motion was to eliminate that standard from those to be considered in the rule of reason analysis.[26] In opposing the ABA's motion, MSL pointed out that the site inspection team had criticized MSL's salary scale and contended that the accreditation refusal was in fact based on MSL's refusal to comply with that standard. Agreeing with the ABA, I stated, "[t]he evidence presently at hand ... does not support MSL's contention that one of the reasons the ABA declined to accredit MSL was non-compliance with the salary criteria." I made it clear, however, that MSL was entitled to *all* information about the denial of its accreditation, keeping open the question of whether the salary standard would get further consideration. This is what I said,

---

**25.** Later the request was reduced to 75 accredited law schools.

**26.** The same contention was made as to standards 602, 603, and 704, all of which deal with law school libraries.

Because the ABA's decision not to accredit plaintiff was based on noncompliance with standards other than 405(a), 602, 603, and 704, these standards cannot be said to have injured MSL. Therefore, the ABA's motion for reconsideration as to these standards must be granted, and the discovery order of May 20, 1994, must be amended to exclude at this time discovery about the development, implementation, discussion, and debate of these standards. Discovery on them *is* permitted, however, to the extent it is necessary to determine if these standards were in fact reasons MSL was denied accreditation. The order of May 20 made clear that MSL is entitled to discovery on all aspects of *its* accreditation file and of ABA discussions and decisions concerning MSL. From those materials it should be sufficient to ascertain if standards 405(a), 602, 603, or 704 were the basis for the decision of any ABA body to deny MSL accreditation. If they were, further discovery on these standards will be allowed. 857 F.Supp. at 460.

This ruling was made in keeping with my decision that initial discovery should lead to information so that a rule of reason analysis could be made.

I can only conclude Mr. Velvel did not read this memorandum, or that if he read it, he did not understand it, or that if he understood it, he forgot it. In his affidavit Mr. Velvel commented that I had "ruled near the inception of the case that MSL cannot obtain discovery on salaries," "indicated apparent bias by accepting, without discovery, the ABA's claim that the salary criteria had played no role in denial of accreditation," "further indicated apparent pro-ABA partiality by holding that MSL could not obtain extraordinary discovery on the subject of salaries," and "virtually excluded from the case the single most important element of the conspiracy charged by MSL." Velvel Aff. at 61, 62.

The petition for mandamus filed with the Court of Appeals goes even further stating "Judge Ditter summarily ruled, at the outset of discovery, that as a matter of fact faculty salaries were not a basis for the ABA's denial of accreditation to MSL and that ABA accreditation activities with respect to faculty salaries are irrelevant in the case below although they are a fundamental charge of the alleged conspiracy." Pl.'s Pet. for Mandamus, at 24.

Plaintiff is simply wrong in its assertion that I "ruled" that faculty salaries were not a basis for the ABA's denial of accreditation to MSL. I placed no limitation at all on the discovery MSL could pursue as to why it had been refused accreditation. There was no summary disposition but an attempt to get the parties to identify the standards that may have injured MSL and then to pursue discovery that would make a rule of reason analysis possible. All this was in keeping with my concept that discovery should focus initially on the issues that have been identified.

By way of contrast, MSL's position is apparently that it needs complete information about all matters pertaining to salaries at each ABA accredited law school. Plaintiff insists without that discovery, it cannot prove the charges it has brought—i.e., faculty salaries at ABA accredited law schools were high because of the defendants' conspiracy. The discovery plaintiff wants is massive in nature. It involves confidential, delicate information. What a law school professor is paid may depend upon an infinite variety of factors, including reputation, skills, student-popularity, scholarly-article productivity, other university salary levels, tuition, and endowment. Sorting out just how the ABA criteria would fit in the scheme of things would require inquiry, judgments, and the balancing of the intangible against the unexplainable—and not for one professor at one law school, but for all professors at 177 (or 75) law schools; not for one year, but for many.

And for what purpose?

If plaintiff was not denied accreditation because of its faculty salary policies, what would these disclosures prove? And even if accreditation was denied because of plaintiff's refusal to comply with the ABA salary criteria, what would these disclosures prove?

Up to now, plaintiff has not articulated any reason that would justify my turning it loose on the files of other law schools. It has not

articulated any theory as to how it was injured by the requirement that other schools pay high faculty salaries, and to the contrary, has alleged that it has benefitted from the high salaries paid by other law schools. According to plaintiff's complaint, its salary policies and practices, which it says are in direct conflict with the ABA's policies and practices, have enabled it to keep costs down and made it possible for MSL to charge relatively low tuition, tuition which is only 60 percent of the median tuition at private law schools in New England and thus attract students.

Directing discovery involves decisions. It is a mischaracterization of my rulings to suggest that they dismissed claims or granted summary judgments. My attempts to focus discovery on identifiable issues could not be taken by a reasonable observer as an indication of partiality.

### B. *The Dismissal of the Individual Defendants*

 The complaint in this case names the ABA, three organizations involved in legal education, and 22 individuals as defendants. My dismissal of these 22 individual defendants for lack of jurisdiction is another example, Mr. Velvel argues, of my partiality.[27] Mr. Velvel contends that I acted improperly because I did not allow sufficient time for plaintiff to pursue discovery as to the court's jurisdiction over these 21 defendants. The complaint in this case was filed on November 23, 1993, with simultaneous discovery requests. My order of dismissal was dated March 11. The case was in preparation for more than a year. Velvel Aff. at 57. Just why between November 23, 1993, and March 11, 1994, there was insufficient time to pursue the necessary discovery was not made clear to me. What I do know, however, is that no matter how much additional time I would have allowed for discovery, it would have availed plaintiff nothing. My order of dismissal is reported at 846 F.Supp. 374

(E.D.Pa.1994). In that opinion, I made the following statement as footnote 7:

I have serious reservations about whether the individual defendants, alleged to be on various ABA committees or carrying out the ABA's work in accrediting law schools, can conspire with the ABA. Section one of the Sherman Act applies only to concerted action, proof of which requires evidence of a relationship between at least two legally distinct persons or entities. *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 702 (4th Cir.1991), *cert. denied* [502 U.S. 1074], 112 S.Ct. 973 [117 L.Ed.2d 137] (1992). It seems doubtful that the individual defendants are acting as distinct entities apart from the ABA during an accreditation review. *See id.* (medical staff indistinct from hospital during peer review process). This opinion does not address that issue; I merely note that plaintiff's complaint, which alleged *all* defendants conspired with each other, may thus allege concerted activity which is legally impossible.

While it is absolutely true that I dismissed the 21 individuals because as to them the plaintiff had failed to establish the court's jurisdiction, I could have done so by holding the plaintiff had failed to state a claim against these defendants.

 It seemed to me fundamental that one who acts for a corporation cannot conspire with that corporation and is not responsible, individually, for what he does on behalf of that corporation. Since the complaint obviously overlooked that basic principle, it was not the product of very careful thought and research. I hesitated to go beyond the broad hint I placed in footnote 7 because it is not my style to play upon the gaps in an attorney's knowledge, particularly when he is engaged in the teaching of the law. It also occurred to me that the plaintiff might believe that one or more of these 21 individuals had done something in his individual capacity

---

**27.** Twenty-one of the individual defendants were associated with the ABA. This is what Mr. Velvel said of them: "The 21 dismissed defendants are headed by ABA Consultant James White, who played the role of white knight in the DLS affair, who was a defendant in a case, brought by Alfred

Avins, in which Judge Ditter was deposed and in which his deposition was read to the jury, and who MSL charges to have been a co-conspirator since at least January 1, 1974 and to be the head of the challenged conspiracy." Velvel aff. at 52.

as contrasted with his corporate capacity and that the complaint might be amended accordingly.

Plaintiff filed a timely motion for me to reconsider my order of dismissal, and on May 31, 1994, in an opinion reported at 853 F.Supp. 843 (E.D.Pa.1994), I did so. Plaintiff had submitted an array of documents which it contended supported the court's jurisdiction over some or all of the individual defendants. I concluded that none of the documents it presented suggested, much less showed, any substantial acts in Pennsylvania in furtherance of the conspiracy alleged in the complaint. I then added that an even more important reason for affirming my earlier order lay in the fact that plaintiff had failed to provide a statement showing it was entitled to relief from any of the individual defendants. I pointed out that the complaint could logically only be understood as asserting that the individual defendants conspired with the organizational defendants of which they were alleged to have been a part or whose activity they are said to have carried out. Citing cases, I added that only legally distinct entities can conspire with each other. My analysis is reported at 853 F.Supp. at 845–848. I concluded the matter by saying, "If the plaintiff cannot state a claim against one or more of these individual defendants, that individual should not be subjected to the expense of and time-consuming arsenal of interrogatories, document demands, and depositions that plaintiff will understandably use in the hope of establishing a basis for personal jurisdiction. If the plaintiff can relate with whom and for what an individual conspired, it may do so. If not, that should end the matter for that defendant."

The plaintiff did not accept my invitation to amend its complaint as to any defendant.

In my order dated June 20, 1994, reported at 855 F.Supp. 108 (E.D.Pa.1994), I dismissed the 22nd defendant. Again I did so on jurisdictional grounds,[28] but my opinion made it very clear that the real reason was plaintiff's failing to state any legal theory showing that this defendant had conspired with anyone. Plaintiff had argued that jurisdiction over a corporate defendant gave the court jurisdiction over individuals who act in a corporate capacity. Again I left the door open for an amendment to the complaint as to this defendant but none was forthcoming.

Had the plaintiff felt that I was wrong in these rulings, it could have pursued an appeal from my decision under 18 U.S.C. § 1292. The provisions of this section are particularly well-suited for antitrust and other protracted cases. *Medomsley Steamshipping Co. v. Elizabeth River Terminals, Inc.*, 317 F.2d 741, 743 (4th Cir.1963). It can certainly be used when an essential party has been improperly dismissed.

The 22 individuals whom I dismissed were improvidently sued in this case. No reasonable observer could conclude my granting their motions was an indication of bias against MSL.

### C. *MSL's Assertion that I Disqualified Its Dean and Other Staff Members from Representing MSL*

 MSL next contends that my disqualification of Mr. Velvel and four members of MSL's staff from acting as counsel in this case, "even on depositions," is further indication of my apparent bias against MSL. Mr. Velvel asserts in his affidavit of October 12, 1994, that I "granted a frivolous motion to disqualify all five of MSL's inside counsel, four of whom ... had been playing a major role for a year and more in determining whether to bring MSL's case ..." Velvel Aff. at 57.

Mr. Velvel is referring to my order of March 15, 1994,[29] but has inadvertently neglected to set forth its temporary nature and limitations, my explanation of that order, our subsequent colloquies about it, and the agreements reached among counsel.

---

**28.** And again, despite the fact that seven months had passed from the filing of the complaint in this case which had been a year in preparation, plaintiff contends I did not give plaintiff enough time for discovery as to jurisdiction over this defendant.

**29.** A copy of this order is attached to this opinion and marked Exhibit A.

First of all, the order only precludes the attorneys in question from acting as *trial* counsel. This is what I said,

> The disqualification "motion goes too far and must be denied in part. The five MSL counsel are not precluded from doing legal research, writing briefs, and lending their antitrust (or other) expertise to the preparations for trial of this case...."

It is equally clear that the order was subject to change if it became apparent that one or more of the attorneys would not be needed as a witness. This is what I said,

> "... if all parties can agree on one or more MSL administrators or professors whom no one will call as a witness, those persons may appear for plaintiffs when depositions are taken and may argue motions. Should it be necessary to use the depositions at trial, that person need not be identified as a member of the MSL faculty or administration."

I explained that my decision was based upon the fact that these attorneys were "likely to provide important testimony about their prior teaching experience, the nature and extent of their practices, why MSL feels that practicing lawyers make good teachers, and how MSL students compare with students at conventional law schools."

I held the matter was controlled by the Rule 3.7 of the Rules of Professional Conduct [30] of this court which calls for disqualification where a lawyer is likely to be a necessary witness at trial. I decided that it was likely these lawyers would be called at trial in view of their knowledge of the issues that were likely to be contested.[31] The soundness of this ruling is bolstered by plaintiff's assertion that these lawyers "possess a wealth of knowledge about the legal and factual is-

sues," Pl.'s Motion for Mandamus, at 16, and played a "major role for a year and more in determining whether to bring MSL's case" Velvel Aff. at 57.

There are three exceptions to the rule, only one of which could be applicable here: the disqualification could cause substantial hardship to the client.[32] I concluded that exception would not apply in view of the fact that no trial date had been set and discovery had just started. Although I did not say so then, it is also apparent that each hour one of the MSL staff members spent on this case would take that person from academic or other duties. MSL's complaint set forth how hard its faculty members work, their heavier than ABA-standards teaching loads, their responsibility for administrative duties, the absence of sabbatical leaves, and other cost-containment measures. These five lawyers, who include Mr. Velvel, an assistant dean, and an associate dean, surely *constitute* a significant percentage of MSL's staff. Mr. Velvel has inadvertently failed to explain the overall benefit to MSL of taking its busy administrators and faculty members out of the class room and sending them around the country to take depositions.

The disqualification matter did not stop with my order of March 15. On June 6, 1994, I heard argument on plaintiff's motion to reconsider that order.[33] During the course of my colloquy with counsel about my order, I pointed out that if all parties could agree that none of the five MSL employees would be witnesses, there would be no disqualification. I was surprised to find that no effort had been made among counsel to make such a determination. I instructed counsel to see if they could agree and arranged to

---

**30.** The rules of professional conduct of this court are those adopted by the Supreme Court of Pennsylvania. E.D.Pa. 14 (Rule IV).

**31.** Mr. Velvel argues that since I knew Alfred Avins had been his own lawyer in his case, I should not have disqualified MSL's staff members. Mr. Velvel's logic here escapes me. Moreover, I must confess that when I made this ruling I had not thought of Alfred Avins for a long time and did not think of him then. In any event, there is a difference between representing yourself and representing your own corporation.

**32.** I am aware, of course, the only types of relief specifically claimed in this case are money damages, costs, and attorneys' fees. I did not view the possible loss of attorneys' fees to Mr. Velvel or other members of MSL's staff members to be the type of hardship "to the client" envisioned by the rule.

**33.** Conference dated June 6, 1994, pages 12–23.

see them on the question later that same day.

When we met again, I was told that it had been agreed among counsel that Mr. Velvel and Mr. Devlin would be witnesses and would not therefore represent MSL at depositions. I was also told that it had been agreed that Ms. Rudnick would not be a witness and therefore there would be no restriction in her pre-trial discovery participation. Counsel for the ABA then explained why Mr. Coyne and Mr. Malaguti were likely to be witnesses. I then explored with counsel the participation of Messrs. Devlin and Coyne in pre-trial discovery and was told that the ABA did not object to Mr. Devlin's doing so. I suggested that Mr. Coyne's deposition be scheduled quickly so that it could be determined whether or not he would be a necessary witness and said when that had been done we would consider the matter again. Finally, I reminded all counsel that the disqualification imposed on all of the MSL administrators and faculty was very limited, and I specifically said there was no prohibition against their attending any and all depositions, acting as an adviser, or as a consultant, or making "the snowballs for somebody else to throw." I added, "what I said was they could not take the depositions, and that is pretty much of what I meant."

On July 13, 1994, I again conferred with counsel at which time I reminded them there was still an open question about the disqualification of the MSL administrators and faculty and I reminded them that my disqualification order was a very limited one.

I met with counsel again on August 11, 1995, and stated I had not heard from anyone about the disqualification issues. I was reminded that counsel had agreed that Mr. Velvel would not act as counsel and that since Ms. Rudnick would not be a witness, she would be permitted to act as counsel. I was told that Mr. Coyne had been deposed and that the ABA felt he would be an essential witness.

I met with counsel on September 13, 1994, and asked for a report on the disqualification of MSL's inside counsel. I was told that it was the ABA's position that both Mr. Coyne and Mr. Malaguti would be witnesses at trial

and that MSL agreed Mr. Velvel would be a trial witness and that Professor Rudnick, who would not be a witness, was participating in the preparation of the case. I asked for a written submission in the event that the matter was still an issue. I heard nothing.

Nonetheless, I am sure that when Mr. Velvel says in his affidavit that I injured MSL's ability to pursue the case by "unjustifiably disqualifying all five of its inside counsel" that I "again demonstrated bias against MSL by nearly crippling its ability to litigate the case" by granting the "frivolous motion to disqualify all five of MSL's inside counsel," he not only inadvertently overlooked what I said in my order of March 15 but also what I said on June 6, July 13, August 11, and September 13.

Although Mr. Velvel asserts that this partial disqualification "again demonstrated apparent bias against MSL by nearly crippling its ability to litigate the case," was a "devastating blow" to MSL, ignored the existence of "overwhelming reasons for denying the disqualification motion," was contrary to the applicable law, and caused MSL "severe immediate hardship" by requiring it to hire additional counsel there was no appeal under the provisions of 28 U.S.C.A. 1292.

### D. *Other Matters That Plaintiff Contends Demonstrate My Bias*

Plaintiff contends that in other ways, my conduct in this litigation shows my partiality. For example, in his affidavit, Mr. Velvel says that I appeared to characterize MSL as comparable to a corner grocery and gas station that seeks to run a law school.

What Mr. Velvel finds offensive was contained in my memorandum of May 20, 1994, reported at 853 F.Supp. 837 (E.D.Pa.1994). That memorandum addressed the initial issues and scope of discovery. I pointed out that discovery was to address the rule of reason and was not to be governed by whether something had been alleged to be anticompetitive or not.

This is what I said,

"It is not enough to say, however often and stridently, that the accreditation standards under attack are anticompetitive.

Obviously, *any* criterion serves to restrict competition among law schools if it operates to prevent every corner grocery and gas station from also operating a law school. Section 1 of the Sherman Act prohibits only unreasonable restraints on trade. MSL says it does not make the broad claim that all accreditation standards are illegal, but only that some are. Each of the challenged criteria, therefore, must initially be treated as a separate area of inquiry. Discovery should focus on answering the three questions posed by the rule of reason ...." *Id.* at 840–41.

Obviously there is no suggestion that MSL runs a corner grocery store and law school. No slight was intended. And no slight could reasonably be inferred from what I said.

■ Mr. Velvel also contends that I arbitrarily refused to *permit* the production of a mere two notebooks that in themselves would go far in proving MSL's charges. I believe what Mr. Velvel means is that I refused to *order* the production of the notebooks in question. What he inadvertently neglected to point out was that the question of the notebooks was awaiting a final ruling when the filing of the present motion for my recusal interrupted the orderly flow of that consideration.

■ Mr. Velvel also says that my partiality is demonstrated because I refused to require the ABA to follow the common antitrust practice of producing to MSL any documents produced for the Antitrust Division of the Department of Justice. That may be the common practice, but if it is, it should be revisited. I cannot see what purpose is served by requiring a litigant to disclose irrelevant, confidential, sensitive material that comes from third parties just because it has been sent to the Antitrust Division.

■ Finally, Mr. Velvel asserts that I delayed the case for several months at its inception contrary to the court's own Delay Reduction Plan. In this regard Mr. Velvel points out that although plaintiff's antitrust charges had been explained fully to the ABA months before the complaint was filed, I granted it and the other defendants a month

long extension of time in which to file their answer. While it is true that the extension was granted, what Mr. Velvel fails to mention is the fact that the complaint in this case named 22 individual defendants. There is no assertion that this matter was explained in advance to them just as it was explained to the ABA. I can only assume that this case was brought in good faith against each of them and that plaintiff had every intention of placing them in harm's way for treble damages and attorneys' fees. It did not seem unreasonable then, and not now, to allow these individuals time to prepare their defenses and make decisions concerning counsel. Moreover, this is a case that plaintiff took over a year to prepare. The delay of a month in a suit for treble damages that was so long in the making was more than justified.

Plaintiff also complains that I delayed the initial pretrial conference for almost four months, but inadvertently neglects to point out that in that interim I had the motion to dismiss of the 21 individual defendants before me. I felt a ruling on that motion took priority over a scheduling conference. In any event, the delay could hardly be viewed as one that showed partiality.

## VI. Conclusion

The knowledge that I gained about the Delaware Law School from Judge DiBona and my son's being a student there form no basis for my recusal. No reasonable person could view those events of 20 years ago and conclude they would affect any ruling I might make in this case. No objective observer would believe I lied when, having read plaintiff's complaint, I said I had never thought about the issues it raised. Mr. Kohn correctly concluded my membership on the Villanova Law School Board of Consultors would not affect my ability to be impartial in this case. While my rulings may display a fundamental difference in the appropriate approach to discovery in an antitrust case from those of the plaintiff, they could hardly be said to show bias. There is no basis for my disqualification in this matter.[34]

34. Two days after its last filing in this court in

support of its motion for my recusal, plaintiff

## ORDER

AND NOW, this 20th day of December, 1994, for the reasons set forth in the opinion that accompanies this order, the Motion of Plaintiff under 28 U.S.C. § 455(a) for Disqualification of the Honorable J. William Ditter, Jr., is hereby refused.

## EXHIBIT A

### *ORDER*

AND NOW, this 15th day of March, 1994, upon consideration of the Association of American Law Schools' and the American Bar Association's motions to disqualify plaintiff's counsel, it is hereby ordered that:

Lawrence R. Velvel, Esq., Michael L. Coyne, Esq., Peter Malaguti, Esq., Constance L. Rudnick, Esq., and Joseph E. Devlin, Esq., are disqualified from representing plaintiff as trial counsel, presenting oral argument on pre-trial motions, and appearing on behalf of MSL at the taking of depositions.

In conjunction with this order I make the following findings:

1. This case involves law school accreditation and alleged violations of federal antitrust law. Plaintiff, Massachusetts School of Law ("MSL"), sought accreditation from the defendant, the American Bar Association ("ABA"). The ABA did not accredit MSL. This suit followed, alleging that the ABA's accreditation standards are anticompetitive and that the ABA has abused its monopoly power over accreditation. Plaintiff's complaint also alleged that four organizations and 22 individuals conspired to raise law

filed a petition for a writ of mandamus in the Court of Appeals under the caption *Massachusetts School of Law at Andover, Inc., Petitioner v. Honorable J. William Ditter, Jr., Nominal Respondent and American Bar Association, Law School Admission Services, Inc., Law School Admission Council and The Association of American Law Schools, Inc.*, No. 94–2168, asking that I be directed to disqualify myself. On December 16, 1994, I filed this same opinion with the Court of Appeals with the addition of an appropriate introductory paragraph that stated:

This matter comes before the Court on a petition for a writ of mandamus. I am the nominal respondent and the opinion which follows is filed in accordance with the permis-

school tuitions and professors' salaries and foreclose from legal education people in lower socio-economic classes.[1]

2. The five counsel whom defendants seek to disqualify are all part of the MSL administration and faculty.[2] Lawrence Velvel is the Dean of MSL and also a professor. Michael Coyne is Associate Dean and a professor at MSL. Joseph Devlin is Assistant Dean and an associate professor at MSL. Peter Malaguti is a professor at MSL. Constance Rudnick is an assistant professor at MSL. The AALS seeks to disqualify Velvel and Coyne from appearing as counsel for plaintiff. The ABA seeks to disqualify all five from acting as trial counsel, presenting oral argument on pre-trial matters, and acting as counsel in the taking of depositions.

3. The Rules of Professional Conduct adopted by this court are those adopted by the Supreme Court of Pennsylvania. E.D.Pa.R. 14 (Rule IV). The Rules of Professional Conduct became effective April 1, 1988.

4. Rule 3.7 of the Rules of Professional Conduct reads in part:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) the disqualification of the lawyer would work substantial hardship on the client.

sion granted district court judges in *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 165 (3d Cir.1993). It will also be filed in the district court. The constraints of time have made it necessary to cite to the plaintiff's filings in the district court, not to the appendix filed in support of the present mandamus petition.

1. A more detailed recitation of facts is included in my memorandum and opinion of March 11, 1994.

2. The five MSL counsel were admitted to this court *pro hac vice* on December 23, 1993. Their fitness to practice is not in dispute.

5. The rationale behind the rule is to address certain concerns: that a lawyer who is both trial lawyer and witness will appear to vouch for his or her own credibility when addressing the jury; that the lawyer-witness will have increased stature when being cross-examined; that there may be the appearance of impropriety if the lawyer is seen as distorting the truth for the sake of the client; and that advocacy and testimony will become impermissibly mixed. *Culebras Enter. Corp. v. Rivera–Rios*, 846 F.2d 94, 99–100 (1st Cir. 1988); *Commercial Credit Business Loans v. Martin*, 590 F.Supp. 328, 334 (E.D.Pa.1984). These concerns are magnified when the trial lawyer is not only a witness at the trial but where, as here, the lawyer-witness is also an interested party.

6. I find it is likely that the five MSL counsel will be necessary witnesses at trial. MSL's complaint alleges that it has suffered competitive injury, including loss of prestige, from the ABA's denial of accreditation. MSL also alleges that it has suffered economic damage from decreased enrollment. Among the issues I can foresee in this case are the reasonableness of the ABA's accreditation standards, the ABA's application of the standards, and MSL's reasons for not complying with them.

7. MSL's deans and faculty have first-hand knowledge of the injuries MSL says it has suffered. They are also likely to provide important testimony about their prior teaching experience, the nature and extent of their private practices, why MSL feels that practicing lawyers make good teachers, and how MSL students compare with students at conventional law schools. Plaintiff has stated in its response to the ABA's motion to transfer that it is a "necessity" for MSL to call as witnesses at trial those persons within MSL's control who have evidence concerning this case. The testimony of the MSL counsel relates to contested issues, and so exception (1) to Rule 3.7 is inapplicable.[3]

8. With regard to exception (3), I find that disqualification would not work a substantial hardship on MSL. Among the factors to consider in determining hardship for Rule 3.7 purposes are the proximity to trial date of the disqualification and the amount of time and resources already spent by the disqualified lawyer. *See Freeman v. Vicchiarelli*, 827 F.Supp. 300, 305 (D.N.J.1993). The defendants' motions are timely. No trial date has been set and discovery has barely begun. MSL has already engaged eminently qualified counsel who are not affiliated with MSL, and those attorneys are already familiar with the case.

9. Therefore, because I find that the five MSL counsel will likely be necessary witnesses in this case, and because none of the exceptions to Rule 3.7 apply, the five MSL counsel must be disqualified from acting as trial counsel.

10. While Rule 3.7 applies to disqualify the five MSL counsel from acting as trial counsel, it does not require that they be disqualified from working on out-of-court matters.[4] *Culebras Enter. Corp.*, 846 F.2d at 99 (Rule 3.7 not to be read so broadly as to prohibit rendition of case-related out-of-court services prior to trial). Therefore, AALS' motion goes too far and must be denied in part. The five MSL counsel are not precluded from doing legal research, formulating discovery, preparing pleadings, writing briefs, and lending their antitrust (or other) expertise to the preparations for trial of this case.

11. Taking depositions and arguing pretrial motions in court are another matter, however. It is elementary that counsel should avoid assuming the dual roles of lawyer and witness. *Commercial Credit Business Loans*, 590 F.Supp. at 334. In framing questions during depositions, it is all but impossible for the questioner not to inject his or her own knowledge and assumptions into the questions. Where the questioner personally knows many details and facts about a case, as do the five MSL counsel here, there is the danger that deposition questions will

---

3. Exception (2) is also inapplicable, as this is not a case about an attorney seeking to recover fees owed.

4. The ABA concedes that Rule 3.7 construed literally applies only to trial.

become testimony. Similarly, in arguing pre-trial motions, oral advocacy may impermissibly become testimony. Therefore, the ABA's motion to disqualify the five MSL counsel from not only acting as trial counsel, but also from taking depositions and arguing pre-trial matters in court, must be granted.

12. One reason MSL has given in urging me to allow the five MSL counsel to participate in all pre-trial matters is that its resources are limited, and it will save legal fees if its faculty can handle pre-trial matters. Should MSL succeed in its case, it will recover reasonable attorney's fees. 15 U.S.C. § 15. Nonetheless, in the interest of economy, if all parties can agree on one or more MSL administrators or professors whom no one will call as a witness, those persons may appear for plaintiffs when depositions are taken and may argue motions. Should it be necessary to use the deposition at trial, that person need not be identified as a member of the MSL faculty or administration.