## Lisa Michelle LAMBERT

v.

## Mrs. Charlotte BLACKWELL, Supt., et al.

## No. 01–2511.

United States District Court, E.D. Pennsylvania.

Jan. 18, 2002.

Peter S. Greenberg, Christina Rainville, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for petitioner.

Amy Zapp, Jonelle Harter, Office of Attorney General, Appeals and Legal Services Section, Harrisburg, PA, for respondents.

## MEMORANDUM

DALZELL, District Judge.

On three occasions, the respondents (hereinafter "the Commonwealth") have sought to personalize this habeas case through the filing of motions to recuse. The first such motion was filed the day after the Commonwealth had agreed to Lisa Lambert's release when the mother of the victim on April 16, 1997 made disclosures of such significance that the then-District Attorney of Lancaster County thrice on the record agreed that "relief is warranted". After we denied the Commonwealth's emergency motion to recuse, a panel of the Court of Appeals (consisting of Judges Roth, Lewis and McKee) denied the Commonwealth's petition for mandamus on that issue, citing *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 1155–57, 127 L.Ed.2d 474 (1994). *See In re Commonwealth of Pennsylvania,* No. 97–1280 (3d Cir., Apr. 17, 1997).

After the Supreme Court of the United States denied Lambert's petition for a writ of *certiorari* (which had reposed in that Court for three years), she returned to this Court after her unsuccessful sojourn in the state courts. The Commonwealth again filed a motion to recuse. In an April 20, 2001 Memorandum, we denied that motion, *Lambert v. Blackwell,* 2001 WL 410639 (E.D.Pa., Apr. 20, 2001). At the close of that Memorandum, after stating the many reasons why the Commonwealth's motion was without merit, we described institutional concerns, including one dating back over two centuries, that obliged us to continue presiding over this matter. We concluded with these words:

> One other point deserves mention. It is well-established that, as Judge Ditter put it, "a judge also has an affirmative duty not to recuse himself or herself in the absence of such proof" of disqualification, *Massachusetts Sch. of Law at Andover v. Am. Bar Ass'n,* 872 F.Supp. 1346, 1349 (E.D.Pa.1994), *aff'd* 107 F.3d 1026, 1042–43 (3d Cir.1997), *cert. denied,* 522 U.S. 907,

118 S.Ct. 264, 139 L.Ed.2d 191 (1997); *see also United States v. Burger,* 964 F.2d 1065, 1070 (10th Cir.1992) ("[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." (citation omitted)). Judges in regular active service thus do not have the luxury of avoiding the cases assigned them. This reality of everyday federal court life is rooted in those courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them", an obligation that applies to each of the judges in regular active service who comprise those courts.

We therefore are affirmatively obliged to exercise that "virtually unflagging obligation" and will deny respondents' motion. *Id.* at *6 (footnote omitted).

When the Commonwealth elected to file a third motion to recuse, it offered nothing new in the way of argument that had not been considered in our April 20, 2001 Memorandum. We therefore disposed of it in a footnote to our November 21, 2001 Memorandum, which dealt with more difficult procedural questions. *Lambert v. Blackwell,* 175 F.Supp.2d 776, 779 n. 3 (2001). Thereupon, the Commonwealth again chose to seek review through a petition for a writ of mandamus.[1] Although that petition manifestly is without merit (especially given the extraordinarily high hurdle a mandamus petition must cross), we have nevertheless taken that filing as an occasion to reconsider the decisions we made in April and November of 2001.[2] Our

choice to reflect again has been fortified by a January 9, 2002 Order of the Court of Appeals panel, offering us the opportunity to respond to anything the Commonwealth has filed in the mandamus papers.[3]

The Commonwealth's filing in the Court of Appeals highlights an important institutional question at the heart of this case. That question ultimately goes to what place each federal judge occupies in the structure of liberty that the Framers so carefully constructed in Philadelphia in the summer of 1787.

As we held in April of 1997 and restated in November of 2001, the record here presents an unparalleled case of prosecutorial misconduct. This conclusion was reached after we found, by clear and convincing evidence, no less than twenty-five breaches of Lambert's basic rights, including five instances where the Commonwealth destroyed material evidence, three in which it altered evidence, one in which it tampered with a witness and seven in which it used perjured or fabricated testimony.[4] Since we first published our conclusion on April 21, 1997, no one has brought to our attention any case anywhere in the English-speaking world that undermines the validity of that conclusion. What *has* happened, however, is that the Commonwealth and others, including allies in surprising places, have sought to change the subject by making the issue the identity of the messenger rather than the content of the message.

---

1. In a motion to supplement that petition, the Commonwealth for the first time cited to the Court of Appeals a 1999 interview we gave to a law student, as part of the University of Pennsylvania Law School's Oral History Project. Toward the end of the two-hour taping, the student asked us to identify cases we are most proud of. Though noting that the then-pendency of Lambert's case in the United States Supreme Court precluded any substantive comment, we cited our April 21, 1997 decision as one of five cases in which we took particular pride. The Commonwealth's reliance on this interview—which seeks to equate it with the trial judge's interviews with the *New York Times* and *The New Yorker* in the *Microsoft* case—is palpably frivolous.

2. These not being orders "adjudicating all the claims" in the case, they are "subject to revision at any time", Fed.R.Civ.P. 54(b).

3. Our reconsideration thus seems to us respectful of this order and not inconsistent with the earlier order the panel entered two days before.

4. *See* 962 F.Supp. at 1528–50. It appears, based upon the submissions we received on December 20, 2001, that this last aspect of the Commonwealth's misconduct in this case has continued, now under the aegis of the Pennsylvania Attorney General. We have in mind the Commonwealth's use of Tabitha Buck's perjured testimony in the 1998 PCRA "proceeding" when the then-District Attorney in 1997 disclosed to us that he would not use such tainted testimony after Buck's lawyer wrote to advise us it was perjurious.

It is of course an old debater's trick, when faced with a hopeless argument, to try to turn the discussion to something else. The Commonwealth here cannot change the three thousand page record of prosecutorial misconduct that built day after day before us over three weeks in April of 1997. Rather, it has repeatedly sought to envelop this unprecedented reality in a fog of personal vituperation against the trial judge.

For this judge to continue to preside in this case will merely permit the Commonwealth to continue to change the subject from what really is at issue here. In view of the Court of Appeals's January 9, 2002 Order, the focus will likely stay off the real issue for longer than it will take to complete the predicates in the district court for a regular appeal on the merits.

And what really is at issue here is a wholesale assault by the state against the rights of one citizen. Judge Roth recognized the gravity of this assault when she described this record as "truly shocking." *Lambert v. Blackwell,* 134 F.3d 506, 525 (3d Cir.1998) (Roth, J., dissenting from denial of rehearing *en banc*[5]). Indeed, anyone who is part of the tradition that began in Edward III's time, with the codification of due process as the immemorial right of free English people,[6] will agree that a single case with such unprecedented state-sponsored misconduct presents what is intolerable in a society nourished by that tradition's waters. More pointedly, to the extent that any citizen's rights are so trampled upon, all citizens' rights are in jeopardy.

It is in this respect that a transcendent institutional fact is thrown into the sharpest relief. The rights that Americans enjoy as the core of their liberty would be worthless, mere words on paper, unless an independent judiciary existed with the authority and the will to enforce them. While that institution has, to be sure, a checkered history—*Dred Scott, Buck v. Bell, Korematsu,* and *Barenblatt* come readily to mind[7]—the *possibility* that federal judges may actually uphold fundamental rights, at whatever cost to the judges themselves, is what, together with many soldiers' blood, has made our liberty endure. Thus no explosive device can ever touch the edifice of justice that upholds our liberty. The only way that temple can become rubble is if judges themselves allow others to pull its columns down.

We will not assist any such demolition. To the contrary, in the name of that liberty and for the sake of that temple we will not allow the Commonwealth to continue the unedifying detour of this matter when the real issue is, as we wrote in 1997, the worst case of prosecutorial misconduct in English-speaking experience. It is for these interests of justice that we now recuse.

### ORDER

AND NOW, this 18th day of January, 2002, upon reconsideration, pursuant to Fed. R. Civ. P. 54(b), of the motion for recusal of assigned judge (docket no. 4), and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Paragraph 1 of this Court's Order of November 21, 2001 is VACATED; and

---

5. Judge Roth's statement, which Judges Nygaard, Lewis and McKee joined, was the only one to address the merits. It said:
   > I am familiar with the merits of the habeas proceeding from reading large portions of the transcript of the proceedings before the district court. As a result, I am aware of the evidence of prosecutorial misconduct that occurred during Lambert's original trial. I find it to be truly shocking.

   *Id.* As suggested in our April 20 Memorandum, *supra* at *4–5, when this case returns to the Court of Appeals in a regular appeal, it will be interesting to see if the Commonwealth will be brazen enough to seek the recusal of these judges based upon these words or the equally strong ones two of them wrote in unpublished opinions in connection with Lambert's release while her *certiorari* petition was pending.

6. The Statute of Westminster, 28 Edw. III c. 3 (1354), provided:
   > ... no man, of what state or condition soever he be, shall be put out of his lands, or tenements, nor taken, nor imprisoned, nor indicted, nor put to death, without he be brought in to answer by due process of law.

7. We had occasion to canvass these shameful cases in *Faces in the Courtroom,* 146 U. Pa. L.Rev. 961, 964–71 (1998).

2. Respondents' motion is GRANTED, effective this day.